[No. B047092. Second Dist., Div. One. Oct. 31, 1991.]

GINO OLDHAM, Plaintiff and Appellant, v.
KENNETH W. KIZER, as Director, etc., Defendant and Respondent.

COUNSEL

Joy Young Stephenson for Plaintiff and Appellant.

John K. Van de Kamp and Daniel E. Lungren, Attorneys General, Anne S. Pressman, Lesley A. Sive and Carol P. Wallacker, Deputy Attorneys General, for Defendant and Respondent.

OPINION

**SPENCER, P. J.—**

### INTRODUCTION

Appellant Gino Oldham appeals from a judgment denying his petition for a writ of mandate to set aside respondent's decision denying him Medi-Cal benefits.

### STATEMENT OF FACTS

On August 27, 1982, appellant was shot in the back and through the abdomen; the bullet traversed his colon, small bowel, pancreas, stomach and esophagus. Appellant underwent emergency surgery to repair the damage. He remained hospitalized until October 10, 1982. Details concerning appellant's injury, treatment and condition will be presented in the discussion portion of this opinion as they become necessary to the resolution of the issues.

On November 4, 1982, appellant applied for Medi-Cal benefits; the application was denied for failure to provide verification of income, Social Security number, identification and address. Appellant reapplied on November 29; a notice of action dated December 14 informed him he was entitled to receive Medi-Cal benefits as of November 1.

Appellant applied for retroactive Medi-Cal benefits for August through October 1982 on September 16, 1983; a notice of action dated September 27 informed him his application was denied for failure to provide verification of income and failure to keep an appointment for an interview. On March 13, 1984, appellant's authorized representative (AR) wrote to the state Department of Social Services (DSS) requesting a fair hearing on appellant's eligibility for retroactive Medi-Cal benefits, and a hearing was scheduled for May 17, 1984.

The hearing was held before hearing officer James R. Sharp (ALJ I[1]). He issued his proposed decision on June 21, 1984, and the proposed decision was adopted by respondent on June 27. According to the decision, at the hearing the Los Angeles County Department of Public Social Services (county) indicated it could not locate appellant's case file. However, based on information supplied by appellant's AR, it presumed appellant did not meet the Disability Evaluation Division's (DED) criteria for retroactive benefits, since appellant did not receive retroactive benefits when he was approved for ongoing benefits in December 1982. Additionally, computer records indicated appellant's case was closed in approximately February 1983; the county therefore argued appellant knew or should have known by that date his application for retroactive benefits was denied. Since he had 90 days from that date to request a fair hearing challenging the denial of his request for retroactive benefits, his March 13, 1984 request was untimely and should be dismissed.

Appellant's AR took the position appellant never received a notice of action denying his November 1982 application for retroactive benefits, the county took no action on his application despite repeated requests that it do so, there had been no denial of benefits so the 90-day limitation period had not begun to run and appellant's request for a fair hearing was not untimely. The AR stated that appellant had contacted his eligibility worker (EW) in February 1983 regarding retroactive benefits and was told he would have to wait for them. Appellant waited approximately two months, contacted the EW again and was told his application was still being processed. Appellant's health care provider also contacted the EW in April 1983 regarding retroactive benefits; the provider continued to contact the EW through September 1983, at which time it was told the EW thought the application for retroactive benefits would be denied. Appellant then attempted to see if his hospitalization costs for the retroactive period of August through October 1982 would be covered under the California Children Services Program, since he was a minor during that period, but benefits under that program were denied. Appellant never received a notice of action that his November 1982 application for retroactive Medi-Cal benefits had been denied.

ALJ I found the county did not issue a notice of action denying appellant's November 1982 application for retroactive Medi-Cal coverage for August through October 1982 and, at least through September 1983, it led appellant to believe his application was undergoing a reevaluation process. Absent a

---

[1]Prior to July 17, 1986, hearings were held before referees, or hearing officers. After that date, pursuant to statute, they were held before administrative law judges (ALJs). (Stats. 1986, ch. 415, § 3, p. 1654.) For ease of reference, the hearing officers who conducted hearings in this case prior to July 17, 1986, will be referred to as ALJs even though, technically, they were not at that time.

notice of action, the 90-day period in which appellant could request a fair hearing did not commence until he knew or should have known of the county's action and was made aware of his right to a fair hearing. This did not occur until his AR fully apprised him of the situation in February 1984. Therefore, his March 13, 1984, request for a fair hearing was timely, and the state hearing process retained jurisdiction to review the denial of appellant's November 1982 application for retroactive benefits.

ALJ I also found that in August through October 1982 appellant would not have been eligible for Medi-Cal benefits under the medically indigent (MI) program. Hence, any retroactive coverage would have to be under the medically needy (MN) program. However, no evidence was presented at the hearing as to whether appellant was disabled and entitled to benefits during the retroactive period under the MN program. Therefore, the county was ordered to attempt to locate appellant's case file and secure the DED's evaluation of appellant's disability status during the retroactive period or, if unsuccessful, to contact the DED and either obtain a copy of its earlier evaluation or obtain a new evaluation.

On September 12, 1984, the county issued a "Report of County Compliance with State Hearing Decision" indicating it was unable to comply with the decision at that time, in that appellant had failed to keep a scheduled appointment to complete a DED package to be used to determine his disability status. The county would comply with the decision once appellant completed the package. A disability determination and transmittal dated September 19, 1984, states appellant was not disabled during the retroactive period; as the basis for the determination, it indicated that based on an interview with appellant, "further development will not be done."

On November 3, 1984, appellant's AR wrote to the DSS requesting a new fair hearing on the denial of his application for retroactive benefits. A hearing originally was scheduled for March 28, 1985. However, it was cancelled on March 7 to allow for a full DED evaluation. A disability determination and transmittal dated September 24, 1985, states appellant was not disabled, in that "his impairments did not remain severe enough to preclude all work for 12 continuous months." According to the Disability Evaluation Analyst and the medical consultant who made the determination, appellant had a residual functional capacity for medium work. He previously had worked as a floor stripper and as a shipping and receiving clerk, both of which were defined as medium work. Appellant therefore had the residual functional capacity to return to his past work and could not be found to be disabled. A hearing was then scheduled for March 20, 1986.

The hearing officer at the second hearing, Mike Ossola (ALJ II), certified his proposed decision on April 7, 1986. He identified the issue to be resolved

as whether the county correctly denied appellant's application for retroactive Medi-Cal benefits "because it has no record of claimant requesting such assistance when he applied for Medi-Cal and since the county cannot issue retroactive Medi-Cal benefits to cover medical expenses incurred more than one year prior to the request being received by the county." ALJ II also indicated an issue regarding appellant's eligibility to receive Medi-Cal benefits from January 1, 1983, to the present was not being resolved but was being referred back to the DED for a more complete disability evaluation; this issue was raised at the hearing. He noted appellant's Medi-Cal assistance ended December 31, 1982, "apparently due to the fact that he had been determined eligible under the Medically Indigent Adult [MIA] Program and the termination of that program January 1983."

ALJ II concluded in his proposed opinion that the county erred in denying appellant retroactive Medi-Cal benefits on the stated ground and appellant should be provided with such benefits. By law, when an application for Medi-Cal benefits is approved, the applicant is eligible to receive benefits for the three months prior to the application provided certain eligibility factors are met. Appellant was approved for Medi-Cal benefits as of November 1982 and was thus eligible for retroactive benefits for the preceding three months. The county claimed appellant never requested such retroactive benefits when he applied for Medi-Cal, but ALJ II found it was "not reasonable to accept the county's position that it had no knowledge of the claimant's need for retroactive benefits. Claimant had been shot and seriously wounded resulting in his need to apply for Medi-Cal. Claimant had just been released from the hospital prior to his applying for Medi-Cal; thus, the worker should have been aware of his need for retroactive assistance and properly advised him what was required to apply for such retroactive assistance." Since the county should have but erroneously failed to do this, it was required to correct its error and issue the retroactive benefits.

On April 28, 1986, Alfonso Granda, Chief of State Hearings/MPI, Eligibility Policy Section of the Medi-Cal Policy Division wrote to Lonnie Carlson in the Office of the Chief Referee. His letter requested that the proposed decision of ALJ II be changed to a dismissal of appellant's claim for retroactive benefits. He stated that evidence in appellant's case file showed appellant applied for retroactive benefits on September 16, 1983, but failed to supply the necessary information with his application; it was denied for that reason on September 27 and a notice of action regarding the denial was sent on that date. Based on that notice of action, neither appellant's March 14, 1984, nor his November 7, 1984, request for a hearing was timely.

On May 13, 1986, respondent's decision on ALJ II's proposed decision was sent to Mr. Carlson. It stated respondent ordered a "further hearing" in

the case "to obtain a review of the durational denial and to obtain the disability file so that the Hearing Officer may review the evidence in the case." The decision listed a certification date of April 7, 1986, a compliance date of April 8, 1986, and a must sign by date of May 15, 1986. About May 30, 1986, Mr. Carlson wrote to appellant notifying him a further hearing had been ordered "to obtain a review of the durational denial and to obtain your disability file so that the state Hearing Officer may review the evidence in your case. This further hearing is necessary to correctly determine your eligibility for Medi-Cal benefits."

Appellant's AR wrote to Mr. Carlson on June 23, 1986, objecting to respondent's order on the ground it was issued more than 30 days after receipt of ALJ II's decision. According to the AR, she spoke with personnel from the director's office and the hearing officer's office. They informed her the director's department and referee's office were in the same building, the certified proposed decision was submitted to the director's department on April 7 and "[p]ersonnel at the Director's Department acknowledge receipt of the certified decision on April 8, 1986." The AR requested that the Department of Public Social Services or respondent's office provide at the hearing "logs or any records indicating an actual date of receipt of the hearing officer's proposed decision by the Director or its agent." She also requested that her letter be considered a formal request for a subpoena duces tecum for the requested documents.

The case was assigned for the further hearing to administrative law judge David Schlossberg (ALJ III), and the hearing was held on July 10, 1986. After the hearing, the record was kept open for 60 days for receipt of additional evidence. Apparently, concerned with the timeliness of respondent's decision—Welfare and Institutions Code section 10959 provides the director must act on the proposed decision within 30 days or be deemed to have affirmed it—ALJ III had spoken with Mary Butera, Section Chief of the State Hearing Support Section (SHSS), on July 9, 1986. She wrote back to him on July 14, enclosing a copy of a certification form. It lists a certification date of April 7, 1986, a compliance date of April 8, 1986, and a must sign by date of May 15, 1986. Ms. Butera explained: "Please note the must-sign-by date of May 15, 1986; according to the clerk who processed the case, the case went to DHS [Department of Health Services] 30 days before May 15th, which would make it April 15, 1986. This makes DHS's processing timely." ALJ III sent a copy of the letter to appellant's AR on July 28, 1986.

Appellant's AR wrote to ALJ III on September 22, 1986, requesting a continued hearing and that a number of people be subpoenaed to be present at that hearing. Among those whose presence was requested was the "Direc-

tor of the Department of Social Services [whose testimony] is relevant and necessary to ascertain the date he received the Hearing Officer's proposed decision." ALJ III responded on December 9, 1986, denying the request for the reason that the director of the *DSS* was not the one who acted on ALJ II's proposed decision.

The requested continued hearing never was held and ALJ III certified his proposed decision on January 23, 1987. It was adopted by respondent on February 9, 1987. The first issue addressed in the decision was whether ALJ II's proposed decision should be adopted by action of law for respondent's failure to act on it within 30 days. ALJ III noted that while a proposed decision for the DSS is deemed to have been received on its certification date, the date it was certified for review by the Chief Referee, a proposed decision for the DHS is not, and the date of receipt is the date it actually was received by the DHS. Such was the case here. ALJ III found "[t]he preponderance of the evidence concerning the date the DHS actually received [ALJ II]'s Proposed Decision establishes that date to be April 15, 1986. This finding is based on the written statement signed on July 14, 1986 by Mary Butera, who was then the head of the SHSS. There is some ambiguity in the evidence presented, and the Administrative Law Judge would have obtained additional evidence if the AR had signed the waiver of time form presented to her on December 18, 1986. However, because of the recent possible financial sanctions imposed in the *Ball* court case for late Medi-Cal cases, the Administrative Law Judge was forced to close the hearing record rather than delay this decision any longer, as the deadline for issuing the decision without the additional waiver of time was October 9, 1986." Thus, ALJ III concluded respondent's order for a further hearing was timely, rendering ALJ II's proposed decision null and void.

The next issue addressed was whether appellant had the right to a hearing concerning the discontinuance of his Medi-Cal benefits on December 31, 1982, and, if so, whether he qualified for such benefits at any time between that date and the present. ALJ III observed the March 13, 1984, request for a fair hearing by appellant's AR mentioned only the denial of retroactive Medi-Cal benefits; nothing was said about the need for ongoing benefits from January 1, 1983. Further, although the county never sent appellant or his AR a notice of action regarding the discontinuance of his Medi-Cal benefits, his AR was advised during the May 17, 1984, hearing before ALJ I that appellant's case file had been closed in March 1983. Thus, as of the date of that first hearing, the AR knew or should have known the county had discontinued appellant's Medi-Cal benefits as of December 31, 1982, and the AR should have filed a request for a fair hearing on the discontinuance of the benefits within 90 days thereafter. However, no request was made until the

hearing before ALJ II on March 20, 1986—well beyond the 90-day deadline. Hence, ALJ III concluded, the request was untimely and must be dismissed.

The final issue addressed in ALJ III's decision was whether the county correctly denied appellant's application for retroactive Medi-Cal benefits on the ground he did not qualify for them on the basis of disability. It appeared to ALJ III appellant was eligible for retroactive Medi-Cal benefits under the MI program. However, the proposed decision by ALJ I and adopted by respondent on July 27, 1984, held appellant did not qualify for the benefits under the MI program. Appellant did not request a rehearing within 30 days or petition the court for review of the decision within one year after the decision. Therefore, the decision remained in force and was binding on ALJ III.

ALJ III then examined appellant's eligibility for retroactive Medi-Cal benefits under the MN program. He reviewed the pertinent statutes and regulations, appellant's testimony at the hearing and the medical records in the DED disability file. ALJ III concluded that even though appellant "was obviously unable to work for several months after his gunshot wound, [his] impairments, in combination with his age, education and work history, did not prevent him from engaging in substantial gainful activity for at least 12 continuous months." Toward the end of the 12-month period, appellant's residual functional capacity allowed him at least to perform sedentary work; his residual functional capacity combined with his age and the nature of his impairments prevented him from being considered disabled. Since he did not qualify for Medi-Cal benefits as a disabled person under the MN program, the county properly denied his application for retroactive benefits. Thus, appellant's claim for retroactive Medi-Cal benefits was denied and his claim for ongoing benefits was dismissed.

CONTENTIONS

I

Appellant contends substantial evidence does not support the trial court's decision that respondent acted correctly in ordering a further hearing and setting aside the favorable decision of ALJ II.

II

Appellant asserts substantial evidence does not support the trial court's decision that respondent acted correctly in finding that appellant was not entitled to retroactive Medi-Cal benefits.

## III

Finally, appellant contends substantial evidence does not support the trial court's decision that appellant did not timely request a hearing regarding the discontinuance of his Medi-Cal benefits on December 31, 1982.

### DISCUSSION

### I

Appellant contends substantial evidence does not support the trial court's decision that respondent acted correctly in ordering a further hearing and setting aside the favorable decision of ALJ II. We disagree.

Preliminarily, it is necessary to clarify the standard of review. The trial court's review of respondent's decision denying appellant's application for disability benefits pursuant to his petition for a writ of administrative mandate (Code Civ. Proc., § 1094.5) was governed by the independent judgment rule. (*Frink* v. *Prod* (1982) 31 Cal.3d 166, 180 [181 Cal.Rptr. 893, 643 P.2d 476].) It was required to reconsider the evidence and make its own independent findings of fact. (*Harlow* v. *Carleson* (1976) 16 Cal.3d 731, 735 [129 Cal.Rptr. 298, 548 P.2d 698].)

On appeal, our review of the trial court's judgment is governed by the substantial evidence rule and we must determine " ' "whether the findings and judgment of the trial court are supported by substantial, credible and competent evidence." ' " (*Evans* v. *Unemployment Ins. Appeals Bd.* (1985) 39 Cal.3d 398, 407 [216 Cal.Rptr. 782, 703 P.2d 122].) All conflicts in the evidence must be resolved and all inferences drawn in favor of the judgment. (*Board of Education* v. *Jack M.* (1977) 19 Cal.3d 691, 697 [139 Cal.Rptr. 700, 566 P.2d 602]; *Nestle* v. *City of Santa Monica* (1972) 6 Cal.3d 920, 925-926 [101 Cal.Rptr. 568, 496 P.2d 480].) However, we are not bound by the trial court's determination of questions of law but may make our own independent determinations. (*Evans, supra,* at p. 407.)

Appellant first claims that in May 1986, when respondent ordered a further hearing in the case rather than adopting ALJ II's proposed decision, he had no statutory authority to order that a "further hearing" be conducted by a hearing officer. He only had authority to order a "rehearing."

In May 1986, Welfare and Institutions Code section 10959 (hereinafter section 10959) provided in pertinent part: "Within 30 days after the department has received a copy of the referee's proposed decision, the director may

adopt the decision in its entirety; decide the matter himself on the record, including the transcript, with or without taking additional evidence; or order a *rehearing* to be conducted by himself, the administrative adviser of the department or another referee in behalf of the director. . . . If a rehearing is ordered, it shall be conducted in the same manner and within the same time limits specified for the original hearing." (Italics added.)

A number of sections of the Welfare and Institutions Code were amended in 1986, including section 10959. The purpose of the amendments was to expedite fair hearing decisions by reclassifying referees to administrative law judges and authorizing them to render final decisions in certain cases. (Assem. Bill No. 2207, Sen. 3d reading, Sen. floor analyses, May 20, 1986; Assem. Bill No. 2207, Assem. concurrence in Sen. amendments as amended May 20, 1986.) The amendments took effect July 17, 1986.

Section 10959 was amended to read in pertinent part: "Within 30 days after the department has received a copy of the administrative law judge's proposed decision, the director may adopt the decision in its entirety; decide the matter himself or herself on the record, including the transcript, with or without taking additional evidence; or order a *further hearing* to be conducted by himself or herself, or another administrative law judge on behalf of the director. . . . If a further hearing is ordered, it shall be conducted in the same manner and within the same time limits specified for the original hearing." (Stats. 1986, ch. 415, § 8, italics added.)

Appellant claims a rehearing is fundamentally different from a further hearing. The former "contemplates a new hearing involving the *same* issues addressed in the prior hearing" while the latter "does not anticipate the *same* issues and can deal with new issues." (Italics in the original.) Here, appellant avers, respondent ordered a further hearing to review the denial of ongoing benefits and did not dispute ALJ II's favorable ruling on appellant's application for retroactive benefits; when the further hearing was held, appellant's eligibility for retroactive benefits was erroneously addressed and resolved adversely to appellant.

Respondent, on the other hand, asserts "rehearing" and "further hearing" in section 10959 must be viewed as interchangeable, with no distinction between the two. In respondent's view, "rehearing" generally implies a new hearing on the old evidence, while "further hearing" implies additional evidence may be taken. Pursuant to this view, it would be "absolutely absurd if the court were to conclude [in interpreting the May 1986 version of section 10959] that, simply because respondent decided to order a 'rehearing' to be conducted by himself *or* by an ALJ [*sic*], that the Legislature intended to preclude the taking of additional evidence in this instance while

allowing additional evidence to be taken when respondent decides the matter on the record." (Italics in the original.) The Legislature's substitution of "further hearing" for "rehearing" two months later "was not intended to change the powers of respondent but was intended to clarify his authority to order that additional evidence be taken on a matter through a further hearing conducted by himself or an ALJ."

■ In interpreting a statute, the court's primary goal must be to give effect to the intent of the Legislature. (*Landrum* v. *Superior Court* (1981) 30 Cal.3d 1, 12 [177 Cal.Rptr. 325, 634 P.2d 352].) To do so, it turns first to the words themselves, giving them their usual and ordinary import. (*Moyer* v. *Workmen's Comp. Appeals Bd.* (1973) 10 Cal.3d 222, 230 [110 Cal.Rptr. 144, 514 P.2d 1224].) Additionally, the words used must be construed in context, and statutes must be harmonized, both internally and with each other, insofar as possible. (*California Mfrs. Assn.* v. *Public Utilities Com.* (1979) 24 Cal.3d 836, 844 [157 Cal.Rptr. 676, 598 P.2d 836].) Statutes must be given a reasonable interpretation, and a literal interpretation which will lead to an absurd result will be avoided if possible. (*Verreos* v. *City and County of San Francisco* (1976) 63 Cal.App.3d 86, 96 [133 Cal.Rptr. 649].)

■ The legislative history of a statute is a legitimate and valuable aid in its interpretation (*California Mfrs. Assn.* v. *Public Utilities Com., supra,* 24 Cal.3d at p. 844.) ■ In general, "a substantial change in the language of a statute . . . by an amendment indicates an intention to change its meaning." (*Mosk* v. *Superior Court* (1979) 25 Cal.3d 474, 493 [159 Cal.Rptr. 494, 601 P.2d 1030].) It is presumed changes in wording and phraseology were deliberately made (*Estate of Simpson* (1954) 43 Cal.2d 594, 600 [275 P.2d 467, 47 A.L.R.2d 991]) and that different meanings were intended when different words were used (*Las Virgenes Mun. Wat. Dist.* v. *Dorgelo* (1984) 154 Cal.App.3d 481, 486 [201 Cal.Rptr. 266]).

However, "a mere change in phraseology, incident to a revision of the . . . statute, does not result in a change of meaning unless the intent to make such a change clearly appears." (*Mosk* v. *Superior Court, supra,* 25 Cal.3d at p. 493.) " '[A] consideration of the surrounding circumstances may indicate . . . that the amendment was merely the result of a legislative attempt to clarify the true meaning of the statute.' [Citation.] 'Subsequent legislation clarifying a statute does not change its meaning but merely supplies an indication of legislative purpose which may be considered together with other factors in arriving at the true intent existing at the time the statute was enacted.' [Citation.]" (*In re Connie M.* (1986) 176 Cal.App.3d 1225, 1238 [222 Cal.Rptr. 673].)

■ Another aid in the interpretation of a statute is the contemporaneous administrative construction given it. This is entitled to great weight unless it

is palpably erroneous. (*Allen* v. *California Toll Bridge Authority* (1977) 68 Cal.App.3d 340, 363 [137 Cal.Rptr. 493]; accord, *Culligan Water Conditioning* v. *State Bd. of Equalization* (1976) 17 Cal.3d 86, 93 [130 Cal.Rptr. 321, 550 P.2d 593].)

 The term "rehearing" as used in former section 10959 could be taken to mean an entirely new hearing to address all the issues raised at the previous hearing, with new evidence presented and testimony taken. This interpretation would distinguish a rehearing from the alternative in which the director decides the matter on the record of the previous hearing, with or without taking any additional evidence.

However, there is nothing in former section 10959 to prevent the interpretation of "rehearing" as a new hearing, on all or some of the issues raised in the previous hearing, with the introduction of new evidence but possibly relying on evidence presented at the previous hearing as well. This interpretation would allow the director to accept part of the previous proposed decision but require some issues to be decided anew, as an alternative to adopting the proposed decision in its entirety. In this respect, a "rehearing" could be considered the same as a "further hearing."

The term "further hearing" suggests not, as appellant claims, a hearing to address new issues not raised in the previous hearing. Rather, it suggests an additional hearing on issues previously raised but not resolved to the director's satisfaction. There is nothing in section 10959 to suggest the director is free to unilaterally decide to raise new issues at the further hearing. In fact, Welfare and Institutions Code section 10958.1, adopted at the same time section 10959 was amended (Stats. 1986, ch. 415, § 7.5, p. 1655), limits the issues to be addressed at a hearing to those reasonably related to the request for a fair hearing or those the parties mutually agree to discuss. Section 10959 provides a further hearing must be conducted in the same manner as the original, so the limitations of section 10958.1 would apply at the rehearing.

A "further hearing," like a "rehearing," is given as an alternative to the director adopting the proposed decision in its entirety or deciding the matter himself or herself, on the record, with or without taking additional evidence. This suggests the two may be considered the same.

Additionally, there is nothing in the legislative history of Assembly Bill No. 2207, by which section 10959 was amended, to indicate the reason for the language change from "rehearing" to "further hearing." There is nothing which demonstrates a legislative intent to change the nature of the hearing. This suggests a legislative intent in changing "rehearing" to "further hear-

ing" simply to clarify the previous language—possibly to avoid confusion between a director-ordered rehearing pursuant to section 10959 and a county- or claimant-requested rehearing pursuant to Welfare and Institutions Code section 10960—rather than to change its meaning. (*Mosk v. Superior Court, supra,* 25 Cal.3d at p. 493; *In re Connie M., supra,* 176 Cal.App.3d at p. 1238.) It does not demonstrate an intent to change the meaning of the statute or support a presumption different meanings for the different terms were intended. (*Mosk, supra,* at p. 493; *Las Virgenes Mun. Wat. Dist.* v. *Dorgelo, supra,* 154 Cal.App.3d at p. 486.)

Respondent obviously treated the terms as equivalent and interchangeable, ordering a "further hearing" at a time when section 10959 provided only for a "rehearing." Respondent's interpretation of the statute may be given great weight unless palpably erroneous which, as discussed above, it is not. (*Allen* v. *California Toll Bridge Authority, supra,* 68 Cal.App.3d at p. 363; accord, *Culligan Water Conditioning* v. *State Bd. of Equalization, supra,* 17 Cal.3d at p. 93.)

On the other hand, in light of the legislative intent to expedite the fair hearing process, the term "further hearing" could be interpreted as something different from, and less time-consuming than, a "rehearing." The "further hearing" could address limited issues and rely on previously-introduced evidence, while the "rehearing" might have required a completely new hearing on all issues previously addressed. This interpretation would be consistent with the general presumption a change in phraseology indicates an intent to change the meaning of a statute. (*Mosk v. Superior Court, supra,* 25 Cal.3d at p. 493; *Las Virgenes Mun. Wat. Dist.* v. *Dorgelo, supra,* 154 Cal.App.3d at p. 486.)

In the circumstances, we must conclude the two terms are interchangeable, both referring to a new hearing, on all or some of the issues raised in the previous hearing, with the introduction of new evidence but possibly relying on evidence presented at the previous hearing as well. The two being interchangeable, the fact respondent ordered a "further hearing" when section 10959 provided for a "rehearing" would not void his order so long as the hearing ordered was on issues raised in the previous hearing and not resolved to respondent's satisfaction in the proposed decision.

Here, respondent ordered a further hearing "to obtain a review of the durational denial and to obtain the disability file so that the Hearing Officer may review the evidence in the case." Appellant interprets this language to mean respondent did not dispute ALJ II's proposed decision as to appellant's eligibility for retroactive Medi-Cal benefits and wanted another hearing on the question of appellant's eligibility for ongoing benefits only, which was

not resolved in the proposed decision. However, the language also can be interpreted as an order for another hearing on the question of appellant's disability, a prerequisite to his eligibility for retroactive benefits. Review of the evidence in appellant's disability file relates to both the issue of his eligibility for ongoing benefits and the issue of his eligibility for retroactive benefits. Interpreted in this light, it is clear the fact respondent ordered a "further hearing" rather than a "rehearing" is of no consequence; the result would have been the same had he ordered a "rehearing"—a new hearing on both issues addressed at the previous hearing and in ALJ II's proposed decision. Too, ALJ III properly addressed both issues at the hearing before him.

 Appellant next claims, in any event, respondent's order for a further hearing is void, in that it was made more than 30 days after his receipt of ALJ II's proposed decision, and thus ALJ II's proposed decision must be deemed affirmed and given effect. Former section 10959 required the director to take action on the proposed decision within 30 days and provided: "Failure of the director to adopt the proposed decision, decide the matter himself on the record, including the transcript, with or without taking additional evidence or order a rehearing within the 30 days shall be deemed an affirmation of the proposed decision."

ALJ II certified his proposed decision on April 7, 1986. Respondent issued his decision ordering a further hearing on May 13, 1986; the decision listed a certification date of April 7, 1986, a compliance date of April 8, 1986, and a must-sign-by date of May 15, 1986. Appellant's AR objected to the further hearing on the ground it was ordered more than 30 days after respondent received ALJ II's proposed decision; according to people she had spoken with in the referee's office and respondent's office, the proposed decision was sent to respondent's office on April 7 and received April 8. She also requested that documents establishing the date respondent received the proposed decision be subpoenaed for the further hearing.

At the hearing before ALJ III, the ALJ stated he had called the DHS and was told he would receive an affidavit or letter or other document to show the proposed decision was received by the DHS on April 15. He also allowed appellant's AR the opportunity of testifying as to the information contained in her letter objecting to the further hearing. The AR stated she spoke to ALJ II on June 17, 1986, and asked him when he sent his proposed opinion to respondent; he said he sent it the same day he certified it, April 7, then he checked with someone and confirmed the case "had gone upstairs that same day." The AR said she then talked to Hortensia Plamants in "the director's" office (apparently, Ms. Plamants did not specify it was the office of the director of the DHS, but the AR asked her if she worked in the office of

"whoever ordered the hearing decision . . . [a]nd she said that's who she was working for") on June 19; Ms. Plamants told her the DHS received ALJ II's proposed decision on April 8. ALJ III stated the April 8 date was not established to his satisfaction, and he would leave the record open to receive more evidence to clarify the matter.

ALJ III received a letter dated July 14 from Mary Butera, Section Chief of the State Hearing Support Section. Ms. Butera enclosed a copy of a certification form, which listed a certification date of April 7, 1986, a compliance date of April 8, 1986, and a must-sign-by date of May 15, 1986, and explained: "Please note the must-sign-by date of May 15, 1986; according to the clerk who processed the case, the case went to DHS 30 days before May 15th, which would make it April 15, 1986. This makes DHS's processing timely."

ALJ III sent a copy of the letter to appellant's AR, who was not satisfied with the explanation it offered and requested a continued hearing. On September 22, 1986, she wrote back, asking that the "Director of the Department of Social Services" be subpoenaed to testify, in that his testimony was "relevant and necessary to ascertain the date he received the Hearing Officer's proposed decision." ALJ III responded on December 9, 1986, denying the request for the reason that the director of the *DSS* was not the one who acted on ALJ II's proposed decision.

On December 16, ALJ III wrote to a Pam Coffey regarding the date on which the DHS received ALJ II's proposed decision; he had spoken to her previously on the subject. He stated: "To me, the evidence is ambiguous whether DHS received this decision on April 8 or whether it received it on April 15 or 16. Since the further hearing was ordered on May 13, it is crucial whether I determine the date of receipt to be April 8 or April 15/16." He discussed his conversation with Mary Butera and the letter he received from her, then wrote: "I have serious questions about the July 14 memo and the Certification Sheet. First, in the memo Mary states that according to the clerk who processed the case, the decision went to DHS 30 days before May 15. I seriously doubt that the clerk would remember this case specifically, considering the hundreds of cases she probably processed that month. Is there some kind of log or computer entry that the clerk referred to when she spoke with Mary which would form the basis for this statement, or was the clerk merely thinking, 'Well, if the "must sign by" date is May 15, then the decision must have been delivered to DHS on April 15.' [¶] Second, I need to know who stamped in the 'must sign by' date on the Certification Sheet—was it SHSS or was it DHS? What is the normal procedure for

completing this date, and are exceptions ever made to this procedure? How do you know for certain whether SHSS or DHS stamped in this date?"

ALJ III also noted the date at the bottom of the certification form was April 8, 1986. He wanted to know whether SHSS or DHS put that date on the form. If SHSS, the proposed decision might not have been delivered to DHS until April 15. If DHS, it might have been delivered on April 8 and sat around for a week until it was logged in by someone. There also was the possibility the case was delivered to DHS on April 8 and the wrong "must sign by" date was stamped on it, but ALJ III wondered how likely this could have been. He requested that Ms. Coffey respond to his letter in writing, under penalty of perjury, and asked her to "please keep in mind that I am unable to resolve my current hearing fairly unless you do respond to this memo."[2]

No continued hearing was held, in that appellant's AR refused to sign a waiver of time form. ALJ III issued his proposed decision on January 23, 1987. He found "[t]he preponderance of the evidence concerning the date the SDHS actually received [ALJ II]'s Proposed Decision establishes that date to be April 15, 1986. This finding is based on the written statement signed on July 14, 1986 by Mary Butera, who was then the head of the SHSS. There is some ambiguity in the evidence presented, and the Administrative Law Judge would have obtained additional evidence if the AR had signed the waiver of time form presented to her on December 18, 1986. However, because of the recent possible financial sanctions imposed in the *Ball* court case for late Medi-Cal cases, the Administrative Law Judge was forced to close the hearing record rather than delay this decision any longer, as the deadline for issuing the decision without the additional waiver of time was October 9, 1986." Thus, ALJ III concluded respondent's order of a further hearing was timely.

Appellant claims "there is absolutely no *credible* or *competent* evidence to support a finding that [respondent] acted on the proposed decision of ALJ [II] *within the mandatory 30 day time period* of receipt . . . . [Respondent] conveniently contends in an unsworn letter that it actually received ALJ [II]'s proposed decision on April 15, 1986. . . . [¶] The evidence supporting [respondent]'s contention when it actually received ALJ [II]'s decision is *incredible*. In fact ALJ [III] himself had difficulty with [respondent]'s contention" as reflected in his December 16, 1986, memorandum to Pam Coffey. The memorandum "shows that well after the hearing, ALJ [III] had serious misgivings about the evidence submitted by [respondent] regarding when

---

[2]This letter by ALJ III to Ms. Coffey is not part of the administrative record; it was submitted as an exhibit in the trial court. There is no response by Ms. Coffey in the record.

ALJ [II]'s proposed decision was received. . . . The unsworn statement he received from Mary Butera in her July 14, 1986 memo . . . was inherently unreliable and ALJ [III] himself did not believe her statement."

Appellant further claims that "[t]he evidence of record shows that ALJ [II] certified his decision on April 7, 1986 and submitted it to [respondent] on April 7, 1986," this evidence being his AR's letter objecting to the further hearing. Appellant adds that the unreliability of Ms. Butera's letter was raised by his AR at the hearing before ALJ III: she "testified that she was told by ALJ [II] that his decision was delivered *upstairs* to [DHS] on April 7, 1986." (Italics in the original.) However, neither letter nor testimony by appellant's AR was sworn. After the testimony, ALJ III indicated the April 8 date for receipt of the proposed opinion was "not established to my satisfaction."

The only evidence ALJ III had to rely on in determining when respondent received ALJ II's proposed opinion was unsworn hearsay of dubious credibility. While he found "some ambiguity in the evidence presented" and would have liked to have obtained additional evidence, after reviewing this evidence ALJ III found "[t]he preponderance of the evidence concerning the date the SDHS actually received [ALJ II]'s Proposed Decision establishes that date to be April 15, 1986. This finding is based on the written statement signed on July 14, 1986 by Mary Butera, who was then the head of the SHSS."

As previously discussed, this court's duty is to determine whether the judgment of the trial court, which upheld ALJ III's findings, is " ' "supported by substantial, credible and competent evidence." ' " (*Evans* v. *Unemployment Ins. Appeals Bd., supra,* 39 Cal.3d at p. 407.) All conflicts in the evidence must be resolved and all inferences drawn in favor of the judgment. (*Board of Education* v. *Jack M., supra,* 19 Cal.3d at p. 697; *Nestle* v. *City of Santa Monica, supra,* 6 Cal.3d at pp. 925-926.) Moreover, neither conflicts in the evidence nor " 'testimony which is subject to justifiable suspicion . . . justif[ies] the reversal of a judgment, for it is the exclusive province of the [trier of fact] to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.' " (*Evje* v. *City Title Ins. Co.* (1953) 120 Cal.App.2d 488, 492 [261 P.2d 279], quoting from *People* v. *Huston* (1943) 21 Cal.2d 690, 693 [134 P.2d 758].) Testimony may be rejected only when it is inherently improbable or incredible, i.e., " 'unbelievable *per se,*' " physically impossible or " 'wholly unacceptable to reasonable minds.' " (*Evje, supra,* at p. 492; accord, *Nash* v. *Prudential Ins. Co. of America* (1974) 39 Cal.App.3d 594, 599 [114 Cal.Rptr. 299].)

■■■ Clearly, the evidence of Mary Butera was subject to justifiable suspicion, based on the dates involved. But it was not physically impossible or wholly unreasonable; in his December 16, 1986, letter to Pam Coffey, ALJ III acknowledged the possibility respondent did not receive ALJ II's proposed decision until April 15, 1986, as Ms. Butera stated. Therefore, this court cannot reject it in favor of the evidence given by appellant's AR. (*Board of Education* v. *Jack M., supra,* 19 Cal.3d at p. 697; *Nestle* v. *City of Santa Monica, supra,* 6 Cal.3d at pp. 925-926; *Evje* v. *City Title Ins. Co., supra,* 120 Cal.App.2d at p. 492.) Instead, we must conclude the judgment of the trial court that the ALJ correctly determined respondent received ALJ II's proposed decision on April 15, 1986, making respondent's May 13, 1986, decision ordering a further hearing timely, is supported by substantial evidence.

## II

Appellant asserts substantial evidence does not support the trial court's decision that respondent acted correctly in finding that appellant was not entitled to retroactive Medi-Cal benefits. Again, we disagree.

Appellant first claims he was entitled to retroactive Medi-Cal benefits under the MI program. Further, ALJ III erroneously concluded he was bound by ALJ I's proposed decision, adopted by respondent, that appellant was not entitled to such benefits, in that appellant failed to timely request a rehearing or petition the court for review of the decision.

ALJ I concluded appellant was not eligible for retroactive Medi-Cal benefits under the MI program, "[t]herefore, any retroactive Medi-Cal coverage must be under the MN program." He then pointed out: "The regulations are quite specific that the county must have verification of an applicant's disability prior to approval of retroactive Medi-Cal coverage," and such verification was lacking, in that the county could not find appellant's disability file. At this point, ALJ I was addressing appellant's eligibility for retroactive Medi-Cal benefits under the MN program, which for appellant required a finding of disability (Cal. Code Regs., tit. 22, § 50203), having already determined appellant was *not* eligible for benefits under the MI program.

ALJ I went on to state: "Since the hearing process has retained jurisdiction, the claimant's subsequent right to a state hearing involving a determination of 'disability' during August, September and October 1982 is expressly preserved. In the event DED finds a lack of disability, as defined under the Social Security Act, the claimant is free to request a state hearing and submit objective medical evidence contrary to the DED conclusion for

the retroactive period." He then remanded appellant's claim "to the extent that Los Angeles County shall again attempt to locate the claimant's county case file which involved his November 1982 retroactive Medi-Cal application and secure the earlier DED evaluation regarding the claimant's disability status during the retroactive review period. If unsuccessful, the county shall contact DED to obtain the status either by securing a copy of that earlier evaluation or initiating and completing another DED referral for a disability evaluation for August, September and October 1982."

ALJ I's proposed opinion was adopted by respondent. Appellant did not timely request a rehearing pursuant to section 10960 or judicial review pursuant to section 10962 of the Welfare and Institutions Code.

Appellant asserts ALJ I's sentence beginning "[s]ince the hearing process has retained jurisdiction . . ." "does not imply that the hearing process only retained jurisdiction of the issues relating to [appellant]'s disability. ALJ [I] found that the hearing process retained jurisdiction of [appellant]'s *entire* case because he used the word 'since' to start the sentence which discusses jurisdiction." (Italics in the original.)

Appellant's assertion regarding use of the word "since" is baseless. In the proposed opinion, ALJ I previously concluded the hearing process retained jurisdiction to review appellant's November 1982 application for retroactive Medi-Cal benefits, in that the county never issued a notice of action denying such benefits which would have triggered the running of the limitations period in which to request a hearing, so appellant's belated request for a hearing actually was timely. "Since" referred back to that conclusion, that the state hearing process—and ALJ I—had jurisdiction over appellant's claim. However, ALJ I decided part of appellant's claim—that he was not eligible for retroactive Medi-Cal benefits under the MI program. He was unable to decide the remainder of appellant's claim—that he was entitled to retroactive Medi-Cal benefits under the MN program. ALJ I concluded that *since* there was still jurisdiction over appellant's claim, appellant was entitled to a hearing on the question of his disability and eligibility for retroactive benefits under the MN program, a hearing which could follow an adverse determination of the issue by the county if appellant's case file was found or a new determination of disability obtained from the DED if appellant's case file was not found. ALJ I did not conclude appellant was entitled to a new hearing on the *entire* case, including those issues already resolved by the ALJ.

ALJ I decided the issue of appellant's eligibility for retroactive Medi-Cal benefits under the MI program, and his proposed decision was adopted by respondent. Appellant did not timely request a rehearing or petition the court

for review of the decision, so it became final. ALJ III correctly found he, and thus respondent, were bound by that decision at the subsequent hearing, and the trial court did not err in upholding that finding. Therefore it was and is unnecessary to address the question whether appellant was eligible for retroactive Medi-Cal benefits under the MI program.

■ Appellant next claims, in any event, he should have been determined to be disabled and eligible for retroactive Medi-Cal benefits under the MN program. ALJ III erroneously "totally ignored" appellant's testimony regarding pain suffered during the 18-month period following his gunshot wound and erred in failing to make specific findings regarding such pain testimony.

Eligibility for Medi-Cal benefits is governed by title 22 of the California Code of Regulations. Section 50201, subdivision (a)(4), of title 22 provides eligibility under the medically needy program. Section 50203, subdivision (a)(1), extends eligibility under the medically needy program to disabled persons. Section 50223, subdivision (a)(1), provides adults are disabled if they meet the definition of disability in title II or title XVI of the Social Security Act.

According to these titles of the Social Security Act, "The term 'disability' means . . . inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." (42 U.S.C. § 423(d)(1)(A); see 42 U.S.C. § 1382c (a)(3)(A); 20 C.F.R. §§ 404.1505(a), 416.905(a).) "An individual . . . shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." (42 U.S.C. § 423(d)(2)(A); see 42 U.S.C. § 1382c (a)(3)(B); 20 C.F.R. §§ 404.1505(a), 416.905(a).) Physical or mental impairment is that which "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." (42 U.S.C. § 423(d)(3); see 42 U.S.C. § 1382c (a)(3)(C); 20 C.F.R. §§ 404.1508, 416.908.) The claimant has the burden of proving disability—both an impairment and its severity. (*Id.*, §§ 404.1512, 416.912.)

In determining whether a person is disabled, both the impairment and the symptoms it produces, including pain, must be considered. The Code of Federal Regulations provides: "If you have a physical or mental impairment, you may have symptoms (like pain, shortness of breath, weakness or ner-

vousness). We consider all your symptoms, including pain, and the extent to which signs and laboratory findings confirm these symptoms. The effects of all symptoms, including severe and prolonged pain, must be evaluated on the basis of a medically determinable impairment which can be shown to be the cause of the symptom. We will never find that you are disabled based on your symptoms, including pain, unless medical signs or findings show that there is a medical condition that could be reasonably expected to produce those symptoms." (§ 404.1529; see § 416.929.)

If the determination of disability cannot be made based on medical factors alone, it also will include consideration of a person's residual functional capacity. (20 C.F.R. §§ 414.1560, 416.960.) This is what the person can do despite his or her limitations (*id.*, §§ 404.1545, 416.945), and such factors as the person's age (*id.*, §§ 404.1563, 416.963), education (*id.*, §§ 404.1564, 416.964) and work experience (*id.*, §§ 404.1565, 416.965).

In support of his claim ALJ III erroneously "totally ignored" his testimony regarding pain suffered during the 18-month period following his gunshot wound and erred in failing to make specific findings regarding such pain testimony, appellant relies on *Varney* v. *Secretary of Health and Human Services* (9th Cir. 1988) 846 F.2d 581. In *Varney*, plaintiff suffered a heart attack, underwent coronary bypass surgery, then suffered a second heart attack. Shortly thereafter, she was in an automobile accident and sustained orthopedic injuries. She applied for Social Security disability benefits; her application was denied. She requested a hearing before an ALJ, where she testified as to constant back pain and headaches, and fatigue and chest pains after performing light housework. The ALJ found plaintiff could not perform her past relevant work but could perform a full range of sedentary work, thus concluding plaintiff was not disabled. Specifically, the ALJ found plaintiff's testimony as to her pain was " 'exaggerated over what [was] corroborated by the weight of the objective medical evidence' and was not credible." (At pp. 582-583.)

The appellate court pointed out pain can significantly limit an individual's ability to work, so subjective pain testimony is an important factor in determining disability. (*Varney* v. *Secretary of Health and Human Services, supra,* 846 F.2d at p. 583.) Nonetheless, in order to be considered, subjective pain complaints must be associated with objective medical impairments which reasonably could be expected to produce such pain. (*Ibid.*) Where an individual testifies as to pain greater than would normally be expected from the objective medical impairment, the ALJ may disregard such testimony. (*Id.* at p. 584.) However, the court required that the ALJ's decision to do so be supported by specific findings. (*Ibid.*) While the court did not decide how specific the required findings must be, it held the requirement of such

findings is not satisfied if the ALJ discredits pain testimony solely on the ground it is not fully corroborated by the objective medical evidence. (*Ibid.*) Concluding that was what the ALJ did in the case before it, the court reversed the judgment and remanded for the ALJ to either accept plaintiff's testimony or make specific findings rejecting it. (*Ibid.*)

*Varney*'s requirement of specific findings is based on a policy of the Social Security Administration. (*Murray* v. *Heckler* (9th Cir. 1983) 722 F.2d 499, 502; see *Varney* v. *Secretary of Health and Human Services, supra*, 846 F.2d at p. 584; *Cotton* v. *Bowen* (9th Cir. 1986) 799 F.2d 1403, 1407; *Bellamy* v. *Secretary of Health & Human Services* (9th Cir. 1985) 755 F.2d 1380, 1382.) The policy was expressed in a booklet distributed to ALJs which provided " 'A specific finding should be made in the decision on the credibility of the claimant's allegation of pain.' " (*Murray, supra*, at p. 502, italics omitted.)

■ Welfare and Institutions Code section 10958 requires the ALJ to "prepare a fair, impartial, and independent proposed decision, in writing." It does not require any specific findings. Appellant does not cite any California authority requiring the ALJ to make specific findings, nor does he cite any authority requiring the state to follow Social Security Administration policies in conducting hearings to determine Medi-Cal eligibility. (Medi-Cal, although a state program, is administered in accordance with the plan set forth under title XIX of the Social Security Act, as well as the Welfare and Institutions Code and California Code of Regulations. (Cal. Code Regs., tit. 22, § 50004.))

Even where federal statutory law is involved, "the law of the state, in the absence of contrary provisions in the federal statute, is controlling in all matters of practice and procedure." (*Bohme* v. *Southern Pac. Co.* (1970) 8 Cal.App.3d 291, 297 [87 Cal.Rptr. 286]; accord, *King* v. *Schumacher* (1939) 32 Cal.App.2d 172, 181 [89 P.2d 466].) Since there is no state statute or regulation requiring the ALJ to make any specific findings, and the federal requirement is based on a Social Security Administration policy and not a statute made applicable to state programs under title XIX of the Social Security Act, this court has declined to impose such a requirement on the ALJ and respondent, instead leaving it to the Legislature or respondent to promulgate such a requirement.

Additionally, as pointed out in *Cooper* v. *Kizer* (1991) 230 Cal.App.3d 1291, 1300 [282 Cal.Rptr. 492], rehearing denied June 11, 1991, the trial court applies its independent judgment in reviewing the administrative record for evidence of disability. This includes making its own determination as to the credibility of witnesses. (*Ibid.*) By contrast, in the federal system, the trial court reviews the administrative decision according to the substan-

tial evidence rule. (*Id.* at p. 1299.) Thus, the value of and need for specific findings by an ALJ is not the same in the state trial courts as it is in the federal. (*Id.* at p. 1300.)

██ As to the question whether substantial evidence supports the judgment appellant was not disabled within the meaning of title 22 of the California Code of Regulations, section 50223, subdivision (a)(1), appellant claims the following evidence establishes he *was* disabled: records of his hospitalization from August 27, 1982, through October 10, 1982, at Fountain Valley Community Hospital following his gunshot wound; records of his hospitalization at Harbor-UCLA Medical Center from February 12 through 27, 1983, for follow-up surgery; records of his treatment as an outpatient from February 27, 1983, through April 7, 1983; records of his hospital visit in December 1983 for epigastric pain; records of an August 1985 visit with an internist for back pain; appellant's March 21, 1985, declaration regarding back pain; and appellant's testimony at the hearing before ALJ III.

The records from Fountain Valley Community Hospital show appellant was admitted on August 27, 1982, with a bullet wound to the abdomen; the bullet traversed his colon, small bowel, pancreas, stomach and esophagus. He was operated on and underwent repair of the damage and a distal pancreatectomy, splenectomy and segmental colectomy with right transverse colostomy and closure of the distal colon. There were numerous complications with the surgery and recovery, including cardiac arrest during surgery and respiratory difficulties during recovery. Appellant was discharged from the hospital on October 10, 1982.

Records show appellant was admitted to Harbor-UCLA Medical Center on February 12, 1983, for a takedown, i.e., reversal, of his colostomy. The operation was successful and without complications, normal bowel function was returned and appellant was discharged on February 27, 1983. His condition was followed in the surgery clinic through April 7, 1983; it was noted he had "[g]ood recovery status post gunshot wound and colostomy closure." Appellant returned in December 1983 with a complaint of mid-epigastric pain; a physical examination revealed "mild localized tenderness in mid-epigastrium" and the impression was "[p]robable intermittent obstruction secondary to adhesions." Appellant next returned in November 1984 for intermittent crampy abdominal pain, vomiting and diarrhea; a physical examination revealed appellant's abdomen was diffusely tender to deep palpation and the impression was that he was suffering from gastroenteritis, probably viral in origin.

Records from the Long Beach Evaluation Medical Group indicate appellant was seen there on August 20, 1985, at the request of the DED.

Appellant's history reviewed his gunshot wound and surgeries, problems with urethritis and urination, stomachaches, especially after big meals, but regular bowel movements and no vomiting. It also noted appellant "is now seeing a physician for his low back pain which goes up to the neck and shoulders for the past year. Pain medications give only transient and intermittent relief. The pain in the back is constant and worse with bending, prolonged standing, walking two blocks or climbing one flight of stairs. He is not able to carry . . . more than 50 lbs. Physical therapy and hot packs with ultrasound did not give significant help." Appellant also "experienced right upper chest pain without shortness of breath or diaphoresis, transient and intermittent about one or two times a month."

A physical examination of appellant's abdomen by Dr. Rocely Q. Ella-Tamayo "[r]evealed multiple surgical scars of previous abdominal surgery. There also is a scar of entrance site of gunshot wound on the left posterior lumbar region. There is no tenderness or organomegaly[3]. Bowel sounds are normoactive." A physical examination of appellant's back "[r]evealed decreased lordosis[4] with pain over the paravertebral area along the lumbar spine. There is no spinal tenderness. Patient is able to flex up to 50° with pain on the back on arising. Straight leg raising is positive up to 70° bilaterally. The patient is able to walk on his toes and heels without difficulty. He is able to squat. His gait is normal." The impression was musculo-skeletal strain of the lumbar spine, a past history of a gunshot wound with multiple intraabdominal injuries status post splenectomy and a history of urethritis.

In appellant's March 21, 1985, declaration as to his disability, he stated the "most important" injury he received was a gunshot wound to his back, which caused a great deal of pain and marked weakness. After his discharge from Fountain Valley Community Hospital, appellant had pain in his back "just moving around the house." He would awaken hunched over and in real pain, unable to move or walk without great difficulty and pain. Standing up for more than an hour would cause great pain, at any time during the day. His back was very weak and he could not do any work or lift at all. These symptoms persisted for 18 months after he was shot. Additionally, in the first twelve months after the shooting, he would be bedridden for three or four days, unable to leave his bed for any reason, about three times a month. At the present, he still had back pain when he arose in the morning which lasted from two to three hours, during which time he was unable to move well, making it impossible for him to work or exercise at all.

[3]Organomegaly is enlargement of the organs. (Dorland's Illustrated Medical Dict. (26th ed. 1985) p. 934, hereinafter Dorland.)

[4]Lordosis is "the anterior concavity in the curvature of the lumbar and cervical spine as viewed from the side." (Dorland, *supra*, at p. 757.)

Appellant also suffered pain and weakness in his left arm. For the first six months after he was shot, the pain and weakness were extensive, preventing him from using his left arm for any kind of work; he would experience sharp pains when he tried to use the arm, and sometimes when he did not try to do any kind of exercise.

Finally, because he was shot in the stomach, appellant suffered pain and discomfort while eating or digesting food. The pain was so great in the first six months after he was shot that he would have been unable to work.

At the hearing before ALJ III, appellant testified he was unable to return to work before August 1, 1983. He was 24 years old, had a high school diploma but no other vocational training or schooling. He had done janitorial and maintenance work and had worked in a shipping and receiving department loading boxes.

Appellant testified he was shot in the back "a lot" of times. When he was released from Fountain Valley Community Hospital, he "could barely walk," and suffered from shortness of breath and dizziness. He still suffered from the shortness of breath and dizziness; he would get dizzy when he got up in the morning and with walking or standing, but not while sitting, and he would get short of breath walking a block or more. When he was released he had weakness in his left arm and his legs; he still had these problems as well. In 1983, his left shoulder was numb and he could not lift over five or ten pounds. Also, he had had trouble with his stomach; if he ate too much he would feel pain near his heart and a lump in his stomach.

Appellant also had trouble sleeping at night since the shooting; this occurred four or five times a week. He thought about his family, which was taking care of him, and felt guilty. He had attempted to but had not seen a psychologist about this problem. He additionally had an episode of depression in November 1985.

Appellant testified all he did around the house was watch television and sometimes watch his sister's children. While he watched television, he experienced pain in his back, which moved up to his shoulders. About three times a week he would wake up with his neck so stiff he could hardly move it; it would stay that way about two days, until he could get pain medication from the doctor. He also got headaches twice a week; they would last all day and he would take Tylenol for them.

ALJ III found that "[a]lthough [appellant] was severely disabled and obviously could not work for a period of time after his gunshot wound, he can qualify as a disabled person under the Medi-Cal Program only if his

impairments are expected to result in death or prevent him from performing substantial gainful activity for at least 12 continuous months. The DED determined that after the 12-month period from the date of the gunshot wound passed, [appellant]'s impairments would not prevent him from performing medium work. This probably was a reasonable conclusion, because the hospital records from Fountain Valley Community Hospital and Harbor-UCLA Medical Center do not show any unusual complications, and the report from Dr. Ella-Tama[y]o showed only a back strain with a mild limitation of motion. But even if [appellant]'s Residual Functional Capacity was reduced to the point where he could perform only sedentary work, he still would not meet the disability requirements of the Medi-Cal Program. Under Medical-Vocational Rule 201.27, [appellant] is not considered disabled. Actually, no one under the age of 44 is considered disabled even if the Residual Functional Capacity is sedentary work, regardless of the individual's work history or education or ability to speak English, unless the person's impairments meet or equal the medical listings referred to in the legal citations or there is some kind of psychiatric impairment. [Appellant]'s testimony indicated that there was an episode of depression in 1985, but that hardly establishes that there was a significant psychiatric problem existing for 12 months in 1982-1983 that would impair his ability to work through July 1983 (the end of the 12-month period). Additionally, [appellant] did not mention any psychiatric problem on the MC 223 form which he completed on May 28, 1985.

"[Appellant] has in fact been employed for a few months at two separate jobs since the date of his injury. Although he may have been laid off or fired due to his disability, these jobs involved medium type work, and his inability to keep these jobs does not establish that he could not perform substantial gainful activity of a sedentary nature. He may not have the education or training or work experience to perform any kind of sedentary work, but Medical-Vocational Rule 201.27 is nevertheless applicable to his situation."

According to appellant's declaration and testimony, he was unable to work for more than a year following his injury due to pain and weakness in his back and his left arm and shoulder. He awoke hunched over and in pain, and he was unable to move or walk without great difficulty or pain for several hours, and sometimes unable to move or walk at all. He could not stand for more than an hour at a time. He could not lift more than five or ten pounds.

He also had trouble eating and digesting food, but that only prevented him from working for the first six months. He had difficulty sleeping and suffered from depression in November 1985, but he did not indicate either of these prevented him from working for 12 months after his injury.

While ALJ III's proposed opinion, which was adopted by the trial court, does not contain specific findings regarding appellant's pain testimony, neither does it establish ALJ III "totally ignored" this testimony. What it focused on was the extent of the injury to appellant's back as demonstrated by the medical evidence. As previously stated, a claimant cannot be found disabled based on evidence of symptoms such as pain "unless medical signs or findings show that there is a medical condition that could reasonably be expected to produce those symptoms." (20 C.F.R §§ 404.1529, 416.929.) It may be inferred from ALJ III's proposed opinion that he found the medical evidence of injury did not support appellant's pain testimony.

ALJ III found "the hospital records from Fountain Valley Community Hospital and Harbor-UCLA Medical Center do not show any unusual complications, and the report from Dr. Ella-Tama[y]o showed only a back strain with a mild limitation of motion." In other words, none of the medical records showed any back injury so severe as to incapacitate appellant to the extent he testified. Additionally, records from the Long Beach Evaluation Medical Group dated August 20, 1985, indicated appellant had been "seeing a physician for his low back pain which goes up to the neck and shoulders for the past year." There is no evidence he even sought treatment for back pain within the first year after his injury.

Even though the DED determined appellant could do medium work, ALJ III was willing to assume appellant's pain and weakness limited him to sedentary work. Sedentary work is defined as work which "involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." (20 C.F.R. § 404.1567(a); see § 416.967(a).) But even if appellant's residual functional capacity limited him to sedentary work, he could not be considered disabled, ALJ III concluded. Rule 201.27 of part 404, subpart P, appendix 2, 20 Code of Federal Regulations provides a claimant between the ages of 18 and 44, who is a high school graduate, with previous work experience limited to unskilled work, and who has a residual functional capacity limited to sedentary work is not disabled.

Appellant indicated after the injury he experienced the most pain walking and moving around, could not stand for more than an hour and could not lift more than five or ten pounds. The 1985 report from the Long Beach Evaluation Medical Group stated appellant's: "pain in the back is constant and worse with bending, prolonged standing, walking two blocks or climbing one flight of stairs. He is not able to carry . . . more than 50 lbs." This

evidence suggests appellant might have been capable of performing sedentary work within the year following the injury. He would mainly have been sitting, only occasionally walking, standing or lifting no more than 10 pounds. Appellant was between the ages of 18 and 44 and a high school graduate; his previous work experience was limited to unskilled work. If he could perform sedentary work, he could not be considered disabled pursuant to rule 201.27.

Based on the foregoing, we conclude there is substantial evidence to support the trial court's finding ALJ III was correct in determining appellant was not disabled, therefore not entitled to retroactive Medi-Cal benefits under the MN program. Appellant's pain testimony was not fully corroborated by the medical evidence, and the evidence showed appellant was capable of performing sedentary work and therefore not disabled.

### III

Appellant contends substantial evidence does not support the trial court's decision that appellant did not timely request a hearing regarding the discontinuance of his Medi-Cal benefits on December 31, 1982. In view of the conclusion reached in part II *ante*, that substantial evidence supports the finding appellant was not disabled following his injury, this contention need not be addressed. Even if appellant did timely request a hearing on the discontinuance of his Medi-Cal benefits, he would not have been entitled to continued benefits since he was not disabled.

The judgment is affirmed.

Devich, J., and Ortega, J., concurred.