Filed 1/27/25  State Center Community College Dist. v. Office of Administrative Hearings CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| STATE CENTER COMMUNITY COLLEGE DISTRICT,<br><br>    Plaintiff and Appellant,<br><br>        v.<br><br>OFFICE OF ADMINISTRATIVE HEARINGS,<br><br>    Defendant and Respondent;<br><br>EDWARD MADEC,<br><br>    Real Party in Interest and Respondent. | F086726<br><br>(Super. Ct. No. 22CECG00215)<br><br><br>**OPINION** |

APPEAL from an order of the Superior Court of Fresno County.  Robert M. Whalen, Judge.

Liebert Cassidy Whitmore, Eileen O'Hare-Anderson and Meredith Karasch for Plaintiff and Appellant.

No appearance by Defendant and Respondent Office of Administrative Hearings.

Siegel, Yee & Brunner & Mehta and Dan Siegel for Real Party in Interest and Respondent.

-ooOoo-

Real party in interest and respondent Edward Madec was a tenured faculty member at Fresno City College (Fresno City), which is part of the State Center Community College District (District), the petitioner and appellant in this matter. Madec also was the head coach of Fresno City's men's basketball team (the team). In November 2018, the District started an investigation into Madec's practices as the team's head coach, which uncovered evidence that Madec violated bylaws of the California Community College Athletic Association (CCCAA) through the provision of housing, food, and apparel to team members. Ultimately, the District determined to discharge him for immoral or unprofessional conduct, dishonesty, evident unfitness for service, and persistent violation of, or refusal to obey, the state's school laws and the District's reasonable regulations under Education Code section 87732.

At Madec's demand, a hearing was held before an administrative law judge (ALJ) with the Office of Administrative Hearings (OAH). After an 11-day hearing where multiple witnesses testified, the ALJ found that while Madec violated some provisions of the CCCAA bylaws, the Education Code, and District board policy and administrative regulations, the District did not establish cause to discipline Madec. The ALJ ordered the charges dismissed.

The District filed a petition for writ of administrative mandamus in the superior court seeking to uphold Madec's dismissal because he persistently violated the rules regarding student athletes to create a winning team, which led to the CCCAA imposing sanctions against the basketball program, and he was dishonest during the investigative process. After briefing and oral argument, the trial court issued a written decision denying the petition.

On the District's appeal from the order denying the petition, the District contends the trial court and ALJ erred by finding that the charges were not supported by the evidence, as there is overwhelming evidence Madec engaged in conduct that justifies his termination. Finding no merit to the District's contentions, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Madec began his career at Fresno City in fall 2006, when he was hired as the head coach of the men's basketball team and a physical education health science instructor. Madec coached basketball at the college for 14 years. Fresno City is part of the Central Valley Conference (the Conference); Madec's teams won the Conference championship each year and the California State championship twice. Madec recruited his players from throughout California, other states, and even other countries. Many players came from difficult circumstances, and a few had been incarcerated.

As a tenured faculty member, Madec was required to abide by several policies and regulations. He was subject to the American Association of University Professors Statement on Professional Ethics (the AAUP Statement), which provides the professional standards for academic professionals. There also are administrative regulations that apply to faculty members. A regulation entitled "Duties and Responsibilities of Instructors" sets forth the duties of instructors, including maintaining a "high level of competency in the subjects taught" and giving "prompt attention to all bulletins and announcements from administrative offices and comply with regulations thus issued." An administrative regulation entitled "Athletics" provides, among other things, that: (1) all rules of the CCCAA are applicable to District athletes; (2) "athletic programs should strive to develop the talents of students and to be competitive through both effective teaching and effective recruiting;" and (3) District employees will abide by both the letter and intent of CCCAA rules and regulations.

The CCCAA, which is responsible for oversight of intercollegiate athletics at California community colleges, sets rules and regulations that govern athletic programs in California's community colleges. The CCCAA constitution and bylaws govern the administration of community college intercollegiate athletics, while sport championship handbooks control the play of the game. The constitution, bylaws, and sport

championship handbooks together constitute the policies and procedures of the CCCAA (collectively, the Rules).

As required by the Rules, Madec attended annual trainings and passed annual examinations on the Rules. At the annual trainings, Madec signed verifications that he received in-service training and passed the compliance exam. Madec also regularly attended meetings with members of the athletic department, including the athletic director and other coaches, where he could ask questions about the Rules. In 2009, Madec received a notice directing him to comply with the bylaws related to violations of the bylaws when Madec allowed recruits to work out at the gym.

***The District's Investigation***

In November 2018, during an unrelated audit to detect fraud, the District compared vendors' addresses against employees' addresses. The report listed 31 lines of three vendors and 11 employees with the same address on Normal Avenue in Fresno (the Normal property). Research revealed they were all Fresno City athletes and that Madec owned the property.

Fresno City's president, Dr. Carole Goldsmith, was made aware of the information uncovered in the audit. Goldsmith contacted the executive director of the CCCAA to advise him of a possible Rules violation as multiple players were living at one address that appeared to belong to a coach. Goldsmith told him the college was going to look deeper into the matter.[1] The executive director was retiring, and he advised Goldsmith to keep the interim executive director aware of the investigation.

In December 2018, the District retained a neutral investigator, Jeffrey Pierce, to investigate concerns that Madec was involved in improper activities as the head men's basketball coach which potentially violated the CCCAA bylaws. The District directed

---

[1] Article 7.4.7.2 of the CCCAA Constitution and Bylaws requires reporting of alleged violations of the Rules to the conference commissioner within two working days after discovery of the alleged violation.

4.

Pierce to investigate and make findings on specific allegations. Pierce interviewed multiple witnesses and reviewed numerous documents. He interviewed Madec three times: on March 7 and June 11, 2019, and January 24, 2020. The investigation lasted 15 months.

In March 2020, Pierce issued a confidential investigation report, which he submitted to the District's general counsel. Pierce found: (1) Madec not only owned the Normal property, which he purchased in 2013 and sold in December 2019, but he had owned other properties including, as relevant here, a property on Cedar Avenue (the Cedar property), which he purchased with his mother, Concetta Lehman, in March 2017, and to whom he sold his interest in August 2019; (2) Madec provided housing to team members at both properties, and it was more likely than not that Madec limited housing at the Normal property to team members; (3) Madec rented the Normal property to team members at below-market rates; and (4) Madec provided a significant amount of food and clothing to team members.

Pierce found other potential issues. For example, Pierce found it was more likely than not that on 11 dates one team member, Student 18,[2] was working as a student worker when he should have been present in Madec's physical education class. Pierce also noted that Madec "made some curious remarks" about players wearing different colored socks depending on the color of uniform they were wearing. Madec told Pierce that during "pride games," which are games in which the team is willing to "fight to the death" because they really wanted to win, the team wears all black uniforms, including black socks, and Madec said, "[m]ost guys take their underwear off for those pride games because they want their balls hanging big."

---

[2]    Pursuant to a protective order, District students were referred to by the term "Student" and a number, rather than by their names.

After the investigative report was issued, Madec was placed on administrative leave with pay and served with a notice of a *Skelly*[3] hearing and a statement of charges. Madec's attorney submitted about 300 pages of documents, numerous declarations, and responses to the statement of charges. The *Skelly* hearing was held in June 2020.

**The CCCAA Sanctions**

In July 2020, Goldsmith sent a written report of potential CCCAA Rules violations in the basketball program to Jennifer Cardone, the CCCAA's interim executive director. Goldsmith's self-reporting of the possible violations was based on Pierce's investigation report, which was attached. Goldsmith proposed self-imposed penalties on the men's basketball program, including a possible one-year postseason ban, forfeiture of wins, a recommendation to exclude Madec as a coach of the team, team meal limitations, and additional compliance oversight and training for the Fresno City athletic department. Cardone referred Goldsmith's report to Susan Yates, the Conference commissioner.

Yates and Coast Conference Commissioner Dale Murray, who Yates enlisted to help because she previously was employed as Fresno City's athletic director, independently reviewed Pierce's redacted report. They also reviewed student eligibility forms and reimbursement requests from the men's basketball account for the 2019-2020 academic year. They did not conduct any other investigation or independently investigate to determine whether Pierce's findings were accurate. They accepted Pierce's report as true and issued findings based on it.

On August 3, 2020, Yates issued a report to Goldsmith with Yates and Murray's findings, which was amended by an August 6, 2020 report (the Yates report). The Yates report identified violations of the following Rules: (1) Bylaw 2.15.2.C—"Providing, securing, obtaining, or offering at less than fair market value, housing for [Fresno City] Men's Basketball players"; (2) Bylaw 2.15.4.B—providing excessive team meals;

---

[3]     *Skelly v. State Personnel Bd.* (1975) 15 Cal.3d 194 (*Skelly*).

(3) Bylaw 2.15—"Providing apparel in excess and used for impermissible benefits";
(4) Bylaw 2.15.B.3—providing impermissible snacks; and (5) Article 7.4.11—not cooperating with an investigation.

The report noted Fresno City's corrective actions, which included additional training on Rules compliance, instituting policies and procedures to present future violations, and Fresno City recommending the exclusion of Madec from the position of head coach or from any coaching position with the basketball team as permitted under article 7.4.11.2.[4] The report also noted Fresno City's self-imposed sanctions: a postseason tournament ban on the basketball team for the 2020-2021 season, and forfeiture of wins for the 2018-2019 and 2019-2020 seasons.

Yates and Murray found the following sanctions were required by the infractions chart:[5] (1) four years of formal probation for the college; (2) the loss of two years postseason competition for the team for the 2020-21 and 2021-22 seasons; (3) a two-game reduction in contests for the team for the 2021-22 and 2022-23 seasons; (4) players who received impermissible benefits were ineligible to participate in CCCAA athletics; (5) the team would forfeit its wins for the 2016-17, 2017-18, 2018-19, and 2019-20 academic years; and (6) Fresno City would return any awards received for the same years. Cardone reviewed the sanctions and approved them.

Fresno City appealed the sanction that declared the student athletes who received impermissible housing benefits, Students 21, 24, and 29, ineligible to participate in CCCAA athletics. The appeals of all three students were approved in September 2020.

---

[4] Article 7.4.11.2 of the CCCAA constitution and bylaws lists permissible disciplinary actions, including "recommendation of exclusion from a coaching assignment."

[5] The infractions chart is used to determine the sanctions to be applied depending on the level of the infraction.

***Madec's Termination***

On October 2, 2020, Goldsmith signed an amended statement of charges which recommended immediate suspension and dismissal. Four days later, Goldsmith signed a "Recommendation for Statement of Decision to Terminate." The amended statement of charges alleged Madec engaged in conduct that warranted his dismissal from employment with the District on the following grounds: (1) immoral conduct (Ed. Code, § 87732, subd. (a)); (2) dishonesty (*id.*, § 87732, subd. (b)); (3) evident unfitness for service (*id.*, § 87732, subd. (d)); and (4) persistent violation of, or refusal to obey, the school laws of the state or District regulations (*id.*, § 87732, subd. (f)).

Madec was offered a second *Skelly* hearing. Madec's attorney submitted over 2,000 pages of documents to the District for the hearing. Neither Madec nor his attorneys, however, appeared at the hearing, and Goldsmith moved to terminate Madec by forwarding the amended statement of charges and recommendation for statement of decision to terminate to the District's Board of Trustees. The Board of Trustees authorized Madec's termination on October 6, 2020.

***The Administrative Hearing***

Madec timely objected to the statement of charges and decision to dismiss him and requested a hearing pursuant to Education Code section 87673. An ALJ from the OAH conducted an evidentiary hearing regarding Madec's discipline. The hearing took place over 11 days in May and June 2021, with 28 witnesses testifying, and over 80 exhibits offered into evidence.

After the parties submitted posthearing briefs, the ALJ issued a 67-page decision dismissing the District's amended statement of charges. The ALJ found the evidence established Madec violated the bylaws, the District's board policies and administration regulations, and the Education Code, in his provision of housing, apparel, and food to team members. The ALJ, however, found the evidence did not establish the District's allegations that Madec obstructed or evaded the District's investigation, or that his

8.

coaching methods and philosophy failed to comport with the applicable ethics standards of the District's written expectations.

As for whether the District established a cause for Madec's termination under Education Code section 87332, the ALJ explained that, taken as a whole, the evidence did not establish Madec's CCCAA violations indicated unfitness to serve as a teacher or coach under the standards articulated in *Morrison v. State Board of Education* (1969) 1 Cal.3d 214 (*Morrison*). The ALJ further found the evidence did not support a conclusion that Madec's conduct constituted immoral conduct, dishonesty, evident unfitness for service, or persistent violation of, or refusal to obey, laws or reasonable regulations within the meaning of Education Code section 87732.

### *The Petition for Writ of Mandate*

The District filed a petition for a writ of administrative mandamus under Code of Civil Procedure section 1094.5, seeking to set aside the OAH's decision and sustain Madec's dismissal from District employment. The District argued OAH's findings of fact were not supported by the weight of the evidence, its legal conclusions were not supported by the findings, the weight of the evidence or the law, and the evidence established Madec engaged in misconduct and should be terminated.

After briefing by the parties and oral argument, the trial court issued a statement of decision denying the petition and affirming the OAH's decision. The trial court found: (1) Madec violated the Rules in his provision of food, housing, and apparel to team members; (2) Madec was not dishonest and the ALJ reasonably concluded the inconsistencies between Madec's hearing testimony and his prior statements were attributable to inadvertence and error, rather than evasiveness or dishonesty; (3) the District did not establish Madec's coaching methods or philosophy fell below the District's reasonable expectations; (4) it would be inappropriate to dismiss Madec for immoral or unprofessional conduct; (5) Madec did not persistently violate or refuse to

obey the Rules as he corrected his behavior when he was made aware of the violations; and (6) Madec was not unfit for service under the *Morrison* factors.

**DISCUSSION**

## I.  Standards of Review

"The applicable standards of review at the superior court and appellate court levels differ depending upon which issues are under review." (*Deegan v. City of Mountain View* (1999) 72 Cal.App.4th 37, 45 (*Deegan*).)  "With respect to culpability, i.e., whether [Madec] committed the misconduct alleged, the superior court has extensive powers of review." (*Ibid.*)  "Where, as here, a trial court reviews a final administrative decision that substantially impacts a fundamental vested right, the trial court both examines the administrative record for errors of law and exercises its independent judgment upon the evidence.  (*Fukuda v. City of Angels* (1999) 20 Cal.4th 805, 816, fn. 8 (*Fukuda*); *Bixby v. Pierno* (1971) 4 Cal.3d 130, 143 (*Bixby*); *Levingston v. Retirement Board* (1995) 38 Cal.App.4th 996, 1000 (*Levingston*).)  In carrying out this independent review, however, the trial court must afford the agency's decision a strong presumption of correctness and must impose upon the petitioner the burden of showing that the agency's findings are contrary to the weight of the evidence, i.e., the decision was not supported by the preponderance of the evidence.  (*Fukuda*, *supra*, 20 Cal.4th at pp. 808, 817, 819–822; *Breslin v. City and County of San Francisco* (2007) 146 Cal.App.4th 1064, 1077 (*Breslin*).)  An abuse of discretion is established if the trial court determines that the findings are not supported by the weight of the evidence.  (*Fukuda*, *supra*, at p. 811.)" (*Alberda v. Board of Retirement of Fresno County Employees' Retirement Assn.* (2013) 214 Cal.App.4th 426, 433.)

In exercising its own independent judgment, the trial court " 'is free to substitute its own findings after first giving due respect to the agency's findings.' " (*Alberda v. Board of Retirement of Fresno County Employees' Retirement Assn.*, *supra*, 214 Cal.App.4th at p. 433, quoting *Fukuda*, *supra*, 20 Cal.4th at p. 818.)  Thus, the

presumption of correctness is rebuttable and may be overcome by the evidence. (*Alberda*, at p. 433.) " '[T]he trial court may reweigh the evidence and substitute its own findings for those of the [agency], after first giving due respect to the [agency]'s findings,' " including "examining the credibility of witnesses." (*Ibid.*)

Here, the trial court exercised its independent judgment and found that while Madec violated the Rules, his violations did not satisfy the grounds for termination as defined in Education Code section 87732.[6] Since there were factual and evidentiary conflicts, the trial court's determination that there was not cause to discipline Madec is conclusive and binding on the reviewing court. (*Deegan*, *supra*, 72 Cal.App.4th at p. 45.) "On appeal, we review the record to determine whether substantial evidence supports the trial court's conclusions, and we resolve all conflicts and indulge all reasonable inferences in favor of the prevailing party." (*Ibid.*; *Bixby*, *supra*, 4 Cal.3d at p. 143, fn. 10.) On questions of law, however, we review the trial court's determinations de novo. (*Duncan v. Department of Personnel Administration* (2000) 77 Cal.App.4th 1166, 1174.) Thus, we will reverse the trial court's decision if it is based on an erroneous conclusion of law. (*Kazensky v. City of Merced* (1998) 65 Cal.App.4th 44, 53.)

The trial court did not reach the issue of the appropriate penalty, as it did not find cause for discipline.[7] Nevertheless, "[w]ith respect to the question of penalty, the

---

[6]     The parties agree that because " 'discipline imposed on [public] employees affects their fundamental vested right in their employment,' " the trial court "was required to exercise its independent judgment on the evidence and find an abuse of discretion if the [office]'s findings of [Madec]'s misconduct were not supported by the weight of the evidence." (*Boctor v. Los Angeles County Metropolitan Transit Authority* (1996) 48 Cal.App.4th 560, 572–573.)

[7]     For this reason, the District's reliance on *County of Santa Cruz v. Civil Service Commission of Santa Cruz* (2009) 171 Cal.App.4th 1577, 1584, for the proposition that our review of the appropriate penalty is de novo, is misplaced. Here, the trial court did not reduce the penalty against Madec; rather, it found that Madec was not subject to discipline as the District failed to establish grounds for discipline under Education Code section 87732. Therefore, our review is for substantial evidence.

superior court's powers of review are quite limited, and are exercised only with great deference to the administrative agency's findings." (*Deegan*, *supra*, 72 Cal.App.4th at p. 45, citing *Cummings v. Civil Service Com.* (1995) 40 Cal.App.4th 1643, 1652.) "Neither the trial court nor the appellate court is entitled to substitute its discretion for that of the administrative agency concerning the degree of punishment imposed." (*Deegan*, at p. 45.) "The appellate court conducts a de novo review of the penalty assessed, giving no deference to the trial court's determination. Again, the appellate court reviews the agency's selection of penalty and, if reasonable minds can differ with regard to the propriety of the disciplinary action, it finds no abuse of discretion." (*Ibid*.) "It is only in the exceptional case, when it is shown that reasonable minds cannot differ on the propriety of the penalty, that an abuse of discretion is shown." (*Id.* at p. 47.)

## II.     The Alleged Rules Violations

The trial court found that Madec violated the Rules, the Education Code, and District Board Policy and Administrative Regulations in his provision to team members of housing, food and snacks, and apparel. The trial court, however, rejected the District's allegations that Madec was uncooperative with the investigation and his coaching methods and philosophy did not comport with the District's reasonable expectations.

On appeal, the District challenges the trial court's factual findings on some of these issues. As an initial matter, we note that much of the District's arguments are premised on the assertion that Madec was not credible and the trial court disregarded inconsistencies between his statements during the investigation and his testimony at the hearing. The trial court, however, considered the District's arguments that Madec's credibility was questionable due to these apparent inconsistencies. The trial court reviewed the entire record and found the OAH based its decision on credible testimony supported by the record.

In essence, the District is asking us to reweigh the evidence and the credibility of the witnesses. That we are not empowered to do. (*Yellen v. Board of Medical Quality*

12.

*Assurance* (1985) 174 Cal.App.3d 1040, 1056; *Duarte v. State Teachers' Retirement System* (2014) 232 Cal.App.4th 370, 384.)  Conflicting evidence, even by the same witness, does not preclude a finding of substantial evidence.  (*People v. White* (2014) 230 Cal.App.4th 305, 319, fn. 14 ["the testimony of a witness is ordinarily sufficient to uphold a judgment 'even if it is contradicted by other evidence, inconsistent or false as to other portions' "]; see *Stevens v. Parke, Davis & Co.* (1973) 9 Cal.3d 51, 67 ["the trier of fact may accept part of the testimony of a witness and reject another part even though the latter contradicts the part accepted"].)  "Moreover, neither conflicts in the evidence nor ' "testimony which is subject to justifiable suspicion … justifi[ies] the reversal of a judgment." ' " (*Oldham v. Kizer* (1991) 235 Cal.App.3d 1046, 1065 (*Oldham*).)  Rather, testimony believed by the trial court "may be rejected only when it is inherently improbable or incredible, i.e., ' "unbelievable *per se*," ' physically impossible or ' "wholly unacceptable to reasonable minds." ' " (*Ibid.*; *White*, at p. 319, fn. 14 ["[t]he circumstances in which an appellate court may properly decline to credit testimony are exceptional and rare"].)

With this in mind, we turn to the trial court's findings with respect to each alleged violation to determine if they are supported by substantial evidence, mindful of our obligation to " 'uphold the trial court's findings unless they so lack evidentiary support that they are unreasonable.' " (*Duarte*, *supra*, 232 Cal.App.4th at p. 384.)

### A.    Housing

In the amended statement of charges, the District alleged Madec violated Bylaw 2.15[8] by renting housing to team members from about June 2013 through at least

---

[8]    Bylaw 2.15.1 provides, in pertinent part:  "Receipt by a prospect/student-athlete of a subsidy, inducement, or special privilege not authorized by the Constitution and Bylaws would be a violation of Bylaw 2…."  Bylaw 2.15.2 defines "[s]ubsidizing" as "providing any manner of service or financial assistance to prospects or student-athletes that is not available to all other students," and provides examples of prohibited service or financial assistance.  These examples include:  (1) under Bylaw 2.15.2.B, "[t]he paying for, the providing of, the pre-payment with expectations of reimbursement, the providing at less

13.

February 2020, at properties he owned in Fresno, namely, a house at the Normal property and a condominium at the Cedar property. The District asserted Madec rented both properties exclusively to team members and, if not exclusively, the properties were not equally available to all Fresno City students. The District also asserted Madec violated Bylaw 2.15, which prohibits providing housing to student athletes "at less than actual cost," when he rented the Normal property to team members for less than fair market value during 2016 through 2019.

The ALJ found that because the evidence established most of the tenants in the Normal and Cedar properties were team members who occupied a greatly disproportionate number of rooms, Madec's rental practices violated Bylaw 2.15.2.C. as the housing was not, as a practical matter, equally available to all Fresno City students. The District, however, failed to establish that Madec violated Bylaw 2.15.2.B by renting the Cedar and Normal properties at "less than actual cost." The ALJ did not make a finding as to the Cedar property because the statement of charges did not allege the rental rates at that property were below cost or outside the range of fair market value. With respect to the Normal property, the ALJ found the evidence did not establish that Madec rented the property at "less than actual cost" for two reasons: (1) no evidence was presented about Madec's actual cost of providing the Normal property for rent or whether his actual cost exceeded the total rent charged; and (2) there was inadequate support for interpreting the term "actual cost" as "fair market value," as the District's witnesses asserted without any support other than their own understanding that "actual cost" meant "fair market value" when interpreting Bylaw 2.15.2.B.

than actual cost or the waiving of a prospect's/student-athlete's tuition, fees, housing, meals, books, supplies, transportation, student body cards, laundry service, clothing, groceries, telephone calls, etc."; and (2) under Bylaw 2.15.2.C, "[t]he obtaining, securing, or soliciting of housing for a prospect/student-athlete that is not available to all students at the community college."

The ALJ further found that even if "actual cost" is interpreted to mean "fair market value," the market study performed by appraiser Scott Rurik, a certified general real estate appraiser who testified at the hearing, did not persuasively establish the fair market rental value of the Normal property for three reasons: (1) he did not look inside the home to check its condition, which obviously could impact rental value; (2) it was impossible to know whether the rentals listed on the multiple listing service, which were the only dwellings included in Rurik's market study, were a representative sample of home rentals, as Rurik did not know what portion of home rentals were included on the multiple listing service; and (3) Rurik's testimony and report did not convincingly establish the Normal property's fair market rental value fell within the general average of the sample set because Rurik based his estimates in substantial part on the average monthly rental rates per unit on the multiple listing service.

The ALJ addressed whether Madec knew or suspected his rental practices violated the bylaws and whether he attempted to conceal his rentals from Fresno City or CCCAA. The ALJ noted the District argued Madec " 'devised a scheme' and 'came up with a secret plan' to provide exclusive discounted housing" to team members, and "he knew his conduct was prohibited," and the person he claimed was the property manager for the properties, Gabe Buenrostro, "was a 'pretend property manager' " who did not provide property management services. The ALJ found the evidence did not support these arguments.

The ALJ found Madec's testimony was credible, as he was honest and sincere in explaining why he became motivated to provide rental housing, and how he developed and followed through with a plan to do so. The ALJ found Madec became interested in providing rental housing because his team members did not live in safe housing and, before buying the Normal property, he talked with Tony Cantu, Fresno City's then-vice

president,[9] about his idea of purchasing rental properties and making them available for rent to student athletes through a property manager. Cantu approved of the plan, which Madec proceeded with based on his understanding it would not violate the bylaws.

The ALJ also found Madec and Buenrostro were sincere, honest, and credible when testifying that Madec hired Buenrostro to serve as an independent property manager of the properties, Buenrostro advertised rentals in publicly available outlets, Madec and other coaching staff members referred team members to Buenrostro as well as other sources of rental housing, and neither Madec nor Buenrostro restricted the rentals to team members. In the ALJ's view, the inconsistencies the District identified between Madec's testimony and his prior statements did not demonstrate Madec was evasive or dishonest. Rather the ALJ found based on the evidence, including Madec's sincerity and credibility at the hearing, the inconsistencies were "most reasonably attributable to inadvertence or error."

The ALJ concluded that, taken as a whole, Madec's "motives to provide safe housing to student-athletes were substantially praiseworthy, though he also had a pragmatic motive to protect the Team's health and well-being, and thereby their competitiveness with other schools." The ALJ noted that while Madec was initially enthusiastic about providing housing to student athletes, that had changed, as he no longer wished to do so and because he no longer owned the rental properties, there was very little to no chance he would rent housing to Fresno City students in the future.

The trial court agreed with the ALJ that: (1) Madec purchased the properties which would be rented to student athletes; (2) he decided to do so after a team member was badly beaten by a local criminal street gang who roamed the area close to where Fresno City students lived; (3) he decided to do what he could to provide safe housing to student athletes who attended Fresno City; and (4) he did so with the full approval and

---

[9]    Tony Cantu passed away before the investigation and administrative proceedings.

16.

encouragement of Cantu and with the understanding that this would not violate any conference bylaws. The trial court found the properties were provided to student athletes at actual cost as required by the bylaws. The trial court further found that a property manager was used to arrange for tenants, maintain the property, and collect rent, and while the rentals were purchased with the thought of providing safe housing to student athletes, they were not restricted to student athletes or team members. The trial court, however, found the evidence showed student athletes primarily occupied the rental properties. Madec divested himself of the properties when he learned the District questioned his motives for purchasing the housing, and while his motives were noble and well-intended, he lost interest in providing housing to students.

On appeal, the District challenges the ALJ's finding, which the trial court adopted, that the inconsistencies between Madec's testimony at the hearing and his statements during the investigation were most reasonably attributable to inadvertence or error. The District asserts this finding ignores that Madec made misrepresentations or gave incomplete answers during his three interviews, a deposition, and his hearing testimony, and that the investigator found Madec's failures to recall during the interviews were implausible.

For example, the District asserts Madec offered "vastly different" explanations for providing housing to student athletes. The District cites to Madec's first interview, claiming Madec stated it was Cantu's idea but then stated it was his idea,[10] and Madec also stated he told Cantu he would stay at Fresno City rather than accept a job offer at another school if he could buy a house the players could live in.[11] The District then cites

---

[10] At the interview, Madec stated that he wanted to create a limited liability company (LLC) and hire a property management company. When asked if he told Cantu about "your idea to form this LLC?", Madec responded, "a lot of it was [Cantu's] idea to be—to be completely honest. But, yeah, it was my idea."

[11] Madec's statements at the interview do not support the District's characterization of the evidence. Madec stated at the interview that he realized Tony Cantu "loved me"

17.

to Madec's hearing testimony that he provided housing to team members so they could live in safe housing after a student athlete was jumped by a gang, arguing that is inconsistent with his prior statements.

These are not "vastly different explanations" of why Madec wanted to provide housing for student athletes, as the District claims. Rather, the trial court reasonably could find that in the interview, Madec was addressing how he and Cantu determined housing could be provided to student athletes and remain in compliance with the bylaws—he could remove himself from running the properties by placing them in an LLC and hiring a property manager.[12] The cited interview statements do not make Madec's stated reason for providing housing—to keep the players safe—"inherently improbable or incredible." (*Oldham*, *supra*, 235 Cal.App.3d at p. 1065.)

The District also asserts that during his interviews, Madec provided "materially inconsistent explanations for hiring a management company," seemed confused about who was managing the Normal property, did not initially identify Buenrostro as the property manager, and at first denied knowing how he received the rent but later stated he collected rent from Buenrostro in cash. We have reviewed the statements the District cites compared to Madec's hearing testimony and find the statements do not render Madec's hearing testimony inherently improbable or wholly unreasonable. Accordingly, we accept the trial court's credibility determination concerning Madec's honesty on the

---

when Madec was offered a job at another school and Cantu refused to write him a letter of recommendation or let him leave Fresno City. Madec went to Cantu about the housing because he was able to seek professional and personal advice from Cantu. Madec told Cantu he had a vision because he had investment properties and he wanted to create an LLC and hire a property management company, and Cantu gave him the "green light" to do what he was doing and keep him in compliance.

[12]    While Madec created SmokeTree Management, LLC with his lawyer's assistance and intended the LLC to become the owner of the properties, he never transferred the properties into the LLC.

18.

issue of housing and his use of Buenrostro as a property manager and that any inconsistencies in his statements were reasonably attributable to inadvertence or error.

The District does not otherwise challenge the trial court's findings concerning Madec's provision of housing. While the District asserts in its statement of facts that Madec provided housing to team members at below-market rates, the District does not make any reasoned argument as to the trial court's finding that Madec provided the properties at actual cost as required by the bylaws or address the ALJ's findings on this issue, which the trial court apparently adopted. The District specifically does not address the findings that it failed to establish the actual cost or fair market rental value of the Normal property, or that the District could not raise the issue with respect to the Cedar property because it was not alleged in the amended statement of charges. Having failed to address the trial court's findings on this issue, we do not address them either. (*Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 852 ["When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived"].)

### B. *Meals and Snacks*

In the amended statement of charges, the District alleged that from 2016 through 2019, Madec violated Bylaw 2.15 by providing food and meals to team members that constituted special privileges not available to other Fresno City students and violated Education Code section 67360[13] by using meals to induce and reward participation in the men's basketball program.

---

**13** Education Code section 67360, subdivision (a)(2), prohibits any person from giving or offering anything of value to a student athlete for the purpose of encouraging or rewarding a student athlete's participation in an intercollegiate athletic program or sporting event.

With respect to food such as snacks, the ALJ found Madec violated Bylaw 2.15.4.B.5[14] because he did not ensure or intend that the snacks be equally available to all Fresno City students. The ALJ cited to Madec's written descriptions on receipts he submitted for reimbursement that clearly indicated the great majority of snacks were for the "team" or "student-athletes" and while Madec invited some nonathletes to partake in the snacks, he did not widely advertise their availability.

With respect to postgame meals, the ALJ noted the bylaws, which prohibit postgame meals unless they are "infrequent 'special occasions,' " do not define the terms "infrequent" or "special occasions" other than the bylaw's clarification that it would be a violation if a team provided a postgame meal "after every home game."[15] The ALJ explained that Conference officials Cardone, Yates, and Murray did not provide a clear and consistent definition of the two terms when testifying at the administrative hearing,[16] but the evidence showed that Madec provided postgame meals on more than an infrequent basis at times that were not special occasions in violation of Bylaw 2.15.4.B.3.

---

[14] Bylaw 2.15.4.B.5 provides, as pertinent here: "Individual student-athletes may receive food, snacks or meals, provided: [¶] a. Student-athletes are treated in the same manner as all other students who have access to campus food pantries."

[15] Bylaw 2.15.4.B.3 provides: "Meals provided prior to home contests are permissible. Post game meals are only permissible if they are infrequent 'special occasions.' It would be a violation if a team was provided a post-game meal by an individual(s) or agency after every home game. This would be a form of subsidization."

[16] Cardone testified the word "infrequent" is not defined in the CCCAA Constitution, but it might be defined as once or twice a semester, although everyone might have a different interpretation of that. She agreed the term "infrequent" needed to be better defined and the rule was not a "model[] of clarity." Yates conceded that some of the rules were not very clear. Yates testified the commissioners believed four or five postgame meals were acceptable, but 15 or 16 were not. Murray testified that "infrequent" means not on a regular basis, and if a basketball team plays 15 home games, he thought there should be no more than three or four postgame meals.

The ALJ also found Madec violated Bylaws 2.15.4.A.1 and 2.15.4.G[17] by holding team banquets and special bonding meals outside the basketball season.

In addition, the ALJ found the evidence established Madec provided meals to student athletes to, at least in part, encourage or reward participation in the program, as shown by Madec holding a team barbecue to "reward them" for their hard work or cooking a meal for the wrestling team because they won the California State Championship. The ALJ therefore found Madec violated Education Code section 67360, subdivision (a)(2), as well as District Board Policy BP 5700 and Administrative Regulation AR 5700, which require individual team coaches to comply with state and federal laws and the bylaws.[18]

The ALJ rejected the District's argument that Madec knew he was violating the bylaws by providing snacks and meals, which the District asserted was evidenced by the fact that he provided dramatically fewer (four) meals during the 2018-2019 fiscal year, when the investigation into this matter began. The ALJ found the evidence did not

---

[17]     Bylaw 2.15.4.A.1. provides, in pertinent part, generally "the giving of specific privileges or special consideration to student-athletes is forbidden by the Constitution and Bylaws," although "certain categories of activities" are permissible, including "[e]nd-of-the-season team banquets." Bylaw 2.15.4.G provides that " 'team building' " activities that take place "during the sport season which are outside of normal practice and competition" are permissible if they are "infrequent special events."

[18]     District Board Policy BP 5700 provides: "The District shall maintain an organized program for men and women in intercollegiate athletics. The program shall not discriminate on the basis of gender in the availability of athletic opportunities. [¶] The Chancellor shall assure that the athletics program complies with federal law, state law, the California Community Colleges Commission on Athletics Constitution and Sports Guides, and appropriate Conference Constitution regarding student athlete participation."

Administrative Regulation AR 5700 provides, in pertinent part: "Individual team coaches are directly responsible to the Athletic Director, Division Dean, Vice President of Instruction, the President/Vice Chancellor-North Centers, and the Chancellor for governance of their own teams and enforcement of established policies and eligibility rules." AR 5700 further provides: "While winning is an important outcome, it is superseded by the educational objectives of the District."

warrant drawing the negative inference that Madec knew or even suspected he might be violating the bylaws prior to the investigation. The ALJ found Madec's testimony was sincere and credible as: (1) he had genuine concerns regarding food insecurity among students on the Fresno City campus; (2) he began providing food to the team and others because he felt it was the right thing to do; (3) it was well-known that he was providing food to the team, other student athletes and occasional members of the general student body; and (4) he received positive feedback on campus for providing meals. The ALJ further found that before the investigation, Madec had no clear reason to believe he was violating the bylaws in providing meals and snacks, citing Cardone's testimony that the words "infrequent" and "special occasions" in the bylaw are not models of clarity.

The ALJ summarized that taken as a whole, Madec's motives for providing snacks and meals to student athletes were substantially praiseworthy even if he had a pragmatic motive to provide adequate protein to help team members build their physical strength and thereby improve their competitiveness with other schools. While Madec strongly believed in the virtue of providing food to Fresno City students, given all that had occurred, it was unlikely he would do so again without prior approval.

The trial court agreed with the ALJ's findings. It found that with respect to snacks, Madec violated Bylaw 2.15.4.5 because, while the snacks were available to all students and there was no evidence anyone was turned away, the availability of snacks to the whole campus was made known by word of mouth rather than a broader advertising campaign.

With respect to meals, the trial court cited the same evidence as the ALJ concerning the notations on the receipts he submitted for reimbursement and the testimony of conference officials that the terms "infrequent" and "special occasions" in the bylaws were not models of clarity. The trial court also cited the ALJ's determinations that Madec's testimony regarding his concerns about food insecurity for Fresno City students was sincere and credible, that he began feeding the team and others because he

22.

felt it was the right thing to do, he received positive feedback on campus for providing meals, and the ALJ did not believe Madec would do so again without prior approval.

The trial court concluded: "The implicit approval [Madec] received from [Fresno City] by being reimbursed by the college for the food expenditures mentioned above and the praise given to him for engaging in these acts of feeding those he believed to be hungry has now been given a different shade as a result of his termination."

On appeal, the District challenges the finding that Madec provided food because he was concerned about food insecurity. The District asserts the evidence instead shows Madec provided food to his players because he wanted to win, as shown by his statements during his interviews that he was "trying to create an advantage to win,"[19] the student athletes needed to eat a certain amount of protein and carbohydrates within 30 minutes of working out to grow and gain weight, and the average student athlete in his program gained between 15 and 25 pounds per season. The District points to what it claims is the absence of evidence that Madec was involved in a wider effort to support food-insecure students on campus.[20]

---

[19]    This statement was made in the context of Madec explaining what he was "trying to do here." Madec stated that he used a property manager because he had "to be able to coach [his] guys hard, and part of the separation is I'm their coach. I'm not their landlord…. I can only wear so many hats…. I have a big set of balls. I'm not bringing balls to an 18, 19-year-old. I'm not doing it, and I never have. Do I push things? Am— am I out of the box? Yes. But I'm not a cheater. I'm not. I'm not a scam artist, but I bust my ass for this program, and I do it by the book to the best of my abilities. I'm not cheating. I'm not sabotaging guys. I'm not subsidizing food. But am I trying to create an advantage to win? Yes. I'm a coach. Look, my track record speaks for itself. For 15 years, every one of these guys leaves and gets a full-ride scholarship."

[20]    For example, the District points to Madec's hearing testimony where he told Goldsmith at one of the *Skelly* hearings that he and Goldsmith both wanted to serve students in feeding them, and his further testimony that he believed he volunteered at the campus food pantry, the Ram Pantry, and all athletic teams, including his team, took turns volunteering there on Fridays. The District asserts Student 21's testimony that he never volunteered at the food pantry contradicts Madec's testimony. Student 21, however, also

The District's argument, however, flies in the face of our standard of review. Since the trial court found Madec credible, we must accept his testimony unless it was "inherently improbable or incredible." (*Oldham*, *supra*, 235 Cal.App.3d at p. 1065.) Madec testified he provided food to team members because there were food insecurities on campus, he was doing what he "felt was the right thing to do is feed people when they're hungry, especially when they're in such need," and he offered food to athletes who were not basketball team members because he was concerned about food insecurity. Madec's testimony that he was concerned about food insecurity is not rendered improbable or incredible because he also had a pragmatic motive to provide adequate nutrition to help team members build their physical strength, he did not feed the team members on gameday before the game, or he did not make snacks equally available to all Fresno City students.

The District also challenges the trial court's finding that the District condoned Madec's behavior.[21] Madec testified that prior to the investigation, no one told him he was doing anything wrong with respect to providing food to players and others. Rather, he said, they did "just the opposite"—they praised and encouraged him, and he was " 'celebrated' for doing such acts."[22] Over the years since Madec began working at

___

testified that he did not know if the basketball team ever volunteered at the food pantry. Therefore, the team may have volunteered at the food pantry.

[21] The District asserts the ALJ did not make such a determination. The ALJ, however, found "[t]he fact that [Madec] was providing food to the Team, other student[]-athletes, and occasional members of the general student body was well-known," and "[h]e received positive feedback on campus for providing meals."

[22] Rhonda Williams, who was the coach of Fresno City's women's softball team, served as acting athletic director in the 2013-2014 academic year and during the spring semester of 2020, and was Madec's colleague for 12 or 13 years, testified she observed Madec barbecue meals for "a lot of people on campus," including Williams' teams. Paul Keysaw, the head coach of Fresno City's men's wrestling team since 2006, attended some meals Madec cooked and served to the basketball team; Madec also prepared food for the wrestling team on three or four occasions. Certainly Madec was not hiding that he provided food for his players and others.

Fresno City, five athletic directors signed off on his requests for reimbursement for meals and food and none of them told him the purchases were inappropriate or improper.[23] Madec further testified the vice president of the College for Business Services signed the forms he submitted to request reimbursement for meals and no one in that office ever indicated to him that his requests for reimbursement were improper. Based on this evidence, the trial court reasonably could infer that Madec received "implicit approval" from Fresno City through the reimbursements for food expenditures. Madec certainly did not hide his requests, but rather identified the purpose of many of them with notations on the receipts.[24]

---

[23] Madec requested reimbursement for purchases for food and snacks for his team members. The District submitted Madec's reimbursement requests and corresponding receipts for purchases of food for snacks and meals during the 2016-2017, 2017-2018, and 2018-2019 fiscal years into evidence. Madec wrote descriptions on the receipts indicating the purpose of each purchase for which he sought reimbursement. The requests were signed by Madec, the athletic director, a dean or vice president, and the vice president of administrative services. Reimbursement came from Madec's Foundation Account, which was available to him as a coach to deposit money from basketball team fundraisers and use the money to support team activities. The expenditures from the account are governed by the CCCAA Rules.

[24] The receipts Madec submitted show that with respect to snacks for the 2016-2017 fiscal year, Madec made 19 separate purchases totaling $1,865.78. Of these purchases, 13 receipts included descriptions stating the food was either for the "team" or "student-athletes." An additional three receipts included descriptions stating the food was for "students/athletes" without specifying whether the food was purchased for "students" and "athletes" or only student athletes. During the 2017-2018 fiscal year, Madec made 13 purchases totaling $766.96, which included descriptions stating the food was for the "team" following workouts, film sessions, or following a "big win." During the 2018-2019 fiscal year, Madec made 14 purchases totaling $963.70, 11 of which included descriptions stating the food was for the "team" or "student-athletes" after workouts. Three receipts included descriptions stating the food was for "post workouts" without specifying whether the food was only for student athletes or also for students engaged in physical education.

With respect to meals, during the 2016-2017 fiscal year Madec made 28 food purchases totaling $3,547.77, from July 2016 through June 2017. During the 2017-2018 fiscal year, Madec made 20 food purchases totaling $2,684.35, from August 2017 through June 2018. During the 2018-2019 fiscal year, Madec made four food purchases totaling

The District asserts it could not have implicitly approved of Madec's provision of food, pointing to the testimony of Fresno City's administrative officials who signed the reimbursement forms. These officials generally testified that when signing off on Madec's requests, they did not review Madec's receipts as they related to the CCCAA bylaws and they could not tell from the receipts what they were for—whether for a pre- or postgame meal, or a special occasion. Instead, they only looked at the receipts to ensure the expenditures were for the team's benefit and relied on Madec to follow the bylaws. Even so, the trial court reasonably could find that Madec's reimbursement requests, particularly those for snacks, and meals and food outside the basketball season,[25] placed the administrators on notice of Madec's provision of food and snacks to the team in potential violation of the bylaws and they implicitly approved of his actions by turning a blind eye to the situation.

### C.    Apparel

The District alleged in the amended statement of charges that Madec provided apparel to team members for their own use and to give to others, which constituted a "subsidy and/or special privilege" not available to all Fresno City students in violation of Bylaw 2.15. The District also alleged Madec violated Education Code section 67360 by using apparel to induce, encourage, or reward participation in the basketball program. Finally, the District alleged Madec purchased apparel from Adidas "because he received a 30 percent 'kickback' from the company."

---

$249.58. Madec provided descriptions on the receipts that stated the food was for occasions including the following: "food"; "food for team meal"; "food for summer team BBQ"; "food for fall team BBQ"; "food for team B-day party"; "food for Xmas team BBQ"; "food for 'New Year' team meal"; "end of school team BBQ"; "end of year celebration"; and "summer team BBQ."

[25]    The bylaws do not permit a coach to provide meals to the team out of the season. Clearly, some of the reimbursements were for team functions that occurred outside the basketball season, which ran from October through mid-March.

The ALJ found Madec violated Education Code section 67360, subdivision (a)(2) because he used apparel to induce, encourage, or reward student athletes' participation in the basketball program. The ALJ determined the evidence established Madec distributed apparel to team members based at least partly on his perception of whether they had "buy in" to the program and "earn[ed] it" through their attitude and participation in the program. Because Madec violated the Education Code, he also violated District Board Policy BP 5700 and Administrative Regulation AR 5700.

The ALJ further found Madec violated Bylaw 2.15.2.B. because he did not distribute the apparel on terms equally available to all Fresno City students. The ALJ, however, determined this was "not an obvious or blatant violation" since Commissioner Murray testified he and Yates could not reach a conclusion about possible apparel violations. The ALJ concluded the evidence did not establish that Madec's motives for providing apparel to students, Fresno City personnel, and local business owners were significantly either praiseworthy or blameworthy.[26]

The trial court agreed with the ALJ that Madec violated the Education Code, as well as District board policy and administrative regulations, to the degree the distribution of apparel to team members was based on a "buy in" to the basketball program as the apparel was used to reward team members' participation or performance. The trial court noted that two Conference officials were unable to agree on whether Madec's distribution of the clothing violated Conference bylaws.

The District does not challenge these findings on appeal. Although the District contends there is no evidence Madec provided apparel to students in need, the trial court did not find otherwise. In an attempt to attack Madec's credibility, however, the District

---

[26] The ALJ determined the evidence did not support the District's allegation that Madec purchased Adidas apparel as part of an alleged "kickback" scheme, as the evidence showed Nicholas Podesta, the team's assistant coach, negotiated the apparel contract with Adidas, which included free apparel if the team purchased specific amounts.

argues Madec provided inconsistent testimony concerning apparel. The District points to Madec's deposition testimony,[27] in which he admitted rewarding players with apparel if they had a "great attitude" and "worked real hard," but denied providing students with apparel to give as a gift in exchange for some sort of benefit, including so the student could get a mechanic's services. Madec further admitted he gave apparel to third parties outside the District, but he denied giving it away for an extra benefit or that he told students they could give apparel away to have a better relationship with District employees. During an investigative interview, however, Madec admitted he told a student to "bring [the tire shop owner] a shirt and we'll cultivate this guy. Maybe he'll give you a better deal."[28] Madec also said that if a student was struggling in a class, he would tell the student to see the teacher during office hours to work on bringing their grade up and if the student followed his advice "the teacher will see how much I cared and when [the student] starts doing better in the class, I'll say why don't you bring [the teacher] a shirt, like, he can come for all the games."

The trial court, however, reasonably could find that Madec's investigative statements and deposition testimony were not inconsistent or that Madec was being dishonest. Madec's investigative statements show that he used apparel to cultivate relationships in the sense that he wanted to gain supporters for the basketball program and not to necessarily obtain better deals or better grades for his players. Rather, Madec testified that it was *after* the student brought his grade up that he suggested the student bring the teacher a shirt and invite the teacher to the games. In our review of the record,

---

[27]  The District took Madec's deposition on April 9, 2021, prior to the administrative hearing.

[28]  Madec explained in the interview that the "tire shop guy" was his neighbor who asked Madec to tell students, not only student athletes, to come to him. Madec stated as an example that he sent a student "to get … mostly hooked up, like, you know, get a good deal, and I told [the student] hey, bring him a shirt and we'll cultivate this guy. Maybe he'll give you a better deal."

28.

the District has not shown that Madec's testimony was "inherently improbable or incredible." (*Oldham*, *supra*, 235 Cal.App.3d at p. 1065.) Accordingly, we must accept the trial court's finding that Madec testified truthfully, and that any inconsistencies were attributable to inadvertence or error.

### D. *Whether Madec Cooperated with the Investigation*

The District alleged in the amended statement of charges that Madec obstructed its investigation by: (1) being "evasive and dishonest" about hiring a property management company; (2) providing "inadequate" written information following the second investigative interview; (3) failing to appear for a scheduled third investigative interview; and (4) being "evasive" and contradicting statements he made in prior interviews, giving implausible answers, or claiming he had not made the statements during his rescheduled third interview. The District further alleged Madec directly or indirectly discouraged team members from cooperating with the investigation, as shown by Madec failing to tell them to "fully cooperate" with the investigation and instead telling them to "do the right thing."

The ALJ found Madec testified sincerely and truthfully regarding his experience with the investigative process. Madec appeared for three interviews, and while he missed a scheduled third interview, it was because he was not notified of it, not because he failed to cooperate. The interview was rescheduled and Madec appeared on short notice with a new attorney.[29] The ALJ further found that while the District identified inconsistencies between Madec's testimony and his prior statements, the inconsistencies did not demonstrate Madec was evasive or dishonest. Rather, based on the evidence, including

---

[29]   During his first and second interviews, Madec was represented by Tom Sharpe, a union attorney who represented Fresno City faculty members. Prior to the third interview, the union stopped representing Madec because the matter involved a coaching, not a teaching, issue. Consequently, Sharpe stopped representing Madec. Thereafter, Madec was represented by private attorney Ryan Griffith.

29.

Madec's sincerity and credibility at the hearing, any inconsistencies were most reasonably attributable to inadvertence or error.

The ALJ also found Madec did not attempt to discourage or dissuade team members from cooperating with the investigation. He helped set up a meeting with the team and Dr. Lataria Hall, the vice president of student services at Fresno City, and told the team to "be truthful." Additionally, he told team members when they asked if they needed to go to the investigative interview that "you have to go to this interview." That some team members did not cooperate, and one of them, Student 21, made a vulgar statement to Pierce when Pierce told him that he could not wait while the other team members finished their interviews, did not reflect on Madec.[30] Rather, Madec told Pierce it "was not acceptable" for a team member to make that profane statement. The ALJ concluded that the evidence did not establish that Madec attempted to obstruct the investigation or discourage any student athletes from cooperating with the investigation.

The trial court noted that the ALJ acknowledged there were inconsistencies between Madec's hearing testimony and his prior statements, but explained the ALJ was present during the testimony and was well placed to make credibility determinations based on his observations. The trial court found the ALJ reasonably concluded any inconsistencies were attributable to inadvertence or error rather than evasiveness or dishonesty, noting the ALJ found Madec "testified sincerely and truthfully." The trial court did not explicitly address the ALJ's other findings on the issue of cooperation.

The District asserts the evidence established that Madec failed to cooperate with the investigation and was untruthful. The District argues Madec knew he had a duty to cooperate but the only evidence of cooperation was his hearing testimony, in which he

---

[30]     Pierce testified that Student 21, who arrived at his interview with three other team members, refused to leave when Pierce requested him to do so. When Pierce reminded him not to talk to the others about his own interview, Student 21 said, "Suck my dick." Student 21 testified he made the statement after Pierce told him he was going to get someone to get him to leave.

testified he believed he "fulfilled that duty [to cooperate] to the best of my ability." The District points to the investigator's testimony that Madec cooperated with the investigation "in the sense that he appeared and conducted interviews," but in the investigator's view, Madec "was not always cooperative in answering questions." The investigator found it implausible that Buenrostro was Madec's property manager for about six years, yet Madec could not answer questions about their business relationship, including where they would meet so Buenrostro could give Madec the rent money Buenrostro collected from the tenants.

The District also claims Madec did not support his students in the investigation process and he simply told them to "do what is right." Finally, the District argues that Madec's numerous contradictions between his investigative interviews, deposition testimony, and hearing testimony regarding his intent in providing housing, Buenrostro's involvement as a property manager, whether snacks were provided equally, Madec's purposes in providing food, and denials of conduct he previously admitted to, establish his lack of cooperation and untruthfulness.

The trial court, however, reasonably could reject the investigator's credibility findings and instead adopt its own finding that Madec testified sincerely and truthfully. As we have explained, we have reviewed the testimony in the administrative record and do not find any of it to be inherently improbable or wholly unreasonable. Accordingly, we accept the trial court's credibility determination in assessing whether substantial evidence supports its findings. (See *Oldham*, *supra*, 235 Cal.App.3d at p. 1065.)

As for whether Madec attempted to discourage team members from cooperating with the investigation, the evidence shows that Madec helped set up a meeting with the team and Hall to attempt to obtain the team members' cooperation, and Madec told the team they needed to share information with Hall and "be truthful." Moreover, Student 21 testified that when his teammates asked Madec if they should go to the interview, Madec responded, "You have to go to this interview," and when Student 21 asked Madec if the

31.

others should go without him, Madec said, "you guys should all cooperate." The investigator acknowledged that no team member told him that Madec discouraged them from speaking with him. The trial court reasonably could find that although Madec may have told the team members that they should do what they thought was right, that does not show that Madec discouraged the team members from cooperating.

### E.     *Madec's Coaching Methods and Philosophy*

The District alleged in the amended statement of charges that Madec made statements during his investigative interviews that demonstrated his coaching methods and philosophy did not comport with the AAUP Statement or the District's expectations for appropriate coaching, instructing, and mentoring.[31] The District also alleged Madec's coaching philosophies and methods developed student athletes who believed it was acceptable to be disrespectful and vulgar to others, refuse to cooperate with an official investigation, and commit academic or financial fraud.

The ALJ found Madec testified credibly and convincingly that his priority was to help students matriculate into four-year universities and he was keenly interested to see what former team members were doing 10 years after leaving Fresno City. The ALJ further found the testimony of students, administrators, and colleagues concerning Madec's character and coaching philosophy, and 117 letters of support that Madec introduced,[32] which contained comments relevant to understanding Madec's coaching

---

[31]     The AAUP Statement provides a general set of professional standards that academic professionals adhere to. It discusses general themes such as "collegiality and cooperation," but does not provide specific guidance on matters such as providing housing and meals. The District's Board Policies and Administrative Regulations provide more specific guidance, including requiring athletic programs to comply with state and federal law, and the bylaws. These are binding on faculty members such as Madec.

[32]     Madec's attorney, Ryan Griffith, testified 117 letters of support were submitted in the *Skelly* hearings and to the District's Board of Trustees. The ALJ admitted the letters as administrative hearsay over the District's objections.

methods and philosophy, provided clear and credible examples of how others experienced Madec's coaching methods and philosophy, and how he has positively influenced people.

The ALJ did not find the evidence supported the District's assertion that Madec's coaching methods and philosophy "have developed student-athletes who believe it is acceptable to be disrespectful and vulgar to others, and to refuse to cooperate in an official investigation." The ALJ first found the evidence did not support a finding that Madec was responsible for or influenced Student 21 to make a vulgar statement to Pierce, or that he influenced any of the student athletes to refuse to cooperate with the investigation.

The ALJ next found the evidence did not support the District's assertion that Madec's coaching methods and philosophy developed student athletes who commit academic or financial fraud. Student 18, who clocked into his work-study program on 11 occasions when Madec marked him present at his physical education class, credibly testified that if he clocked into work-study when he was in class he did so unintentionally. Student 18 explained that work-study students were able to clock in for work using an app on their phones, which started causing problems because the students would forget to clock out, so Donnie Johnson, an athletic equipment manager who supervised work-study students, stopped allowing work-study students to clock in through their phones. Student 18 testified he and other team members knew to "never miss" Madec's class.

The ALJ noted the District identified instances and statements where Madec did not comport with the AAUP Statement or the District's reasonable expectations. This included when Madec sometimes used food and apparel to reward and encourage team members for their participation in the program, and Madec's statement to Pierce during the June 2019 investigative interview that he "buys a ton of gear" and "a ton of food" and he "is going to keep doing it." This raised a question for the ALJ whether Madec would commit the same or similar violations if he were restored to a coaching position. The ALJ concluded he would not because Madec demonstrated a willingness to change his

33.

behavior as evidenced by Madec substantially reducing his food purchases in the 2018-2019 school year, when he learned of the investigation.

The ALJ also found the District correctly asserted Madec's coaching practices did not comport with the AAUP Statement or the District's reasonable expectations when he allowed or encouraged team members to play games without underwear "because they want their balls hanging big."[33] The ALJ found this inappropriate and noted that Madec did not specifically address this issue in his testimony. The ALJ, however, found it was unlikely that Madec would repeat the same or similar violations because Madec changed his behavior with respect to food purchases.

Finally, the ALJ found the weight of the evidence established Madec's coaching methods and philosophy were to help team members advance in their lives as productive contributing members of society, and his efforts had been very effective in achieving this objective. While Madec engaged in conduct that did not comport with the District's reasonable expectations and the standards articulated in the AAUP Statement, when considered in the context of the whole evidence, the District did not establish Madec's coaching methods or philosophy generally fell below those expectations and standards.

The trial court addressed the District's allegation that Madec developed student athletes who believed it was acceptable to be disrespectful and vulgar to others, and to refuse to cooperate in an official investigation. The trial court noted this allegation appeared to be based on Student 21's vulgar comment to the investigator and agreed with the ALJ's finding that any vulgarity the student expressed was not a reflection on Madec. The trial court further noted the ALJ found Madec testified truthfully and convincingly that his priority was to help students matriculate into four-year universities, and found the

---

[33] Madec explained during the interview that the program has pride games where "every guy in our program wears black socks and pride" with their black uniforms and they "fight to the death, like … we're going to win that game." "Most guys they take their underwear off for those Pride games because we want our balls hanging big."

record overwhelmingly backed up this priority as being met based on Madec's testimony and the letters of support. The trial court explained that while the ALJ found Madec made statements and engaged in conduct that did not comport with the District's expectations and standards, the trial court agreed with the ALJ that the District did not establish Madec's coaching methods or philosophy generally fell below the District's reasonable expectations.

The District disagrees with the trial court's characterization of Madec's conduct and motives. It paints his coaching philosophy as one of "win at all costs," where Madec created a " 'brotherhood' in which the students needed to 'buy-in' to create a 'championship culture,' " and students will "buy into the program and will 'bust ass' to earn food, clothing, and his love." The District argues this culture does not comport with the District's overall mission, which requires coaches to know and abide by the Rules.

The District, however, ignores the evidence that supports the trial court's findings that while Madec was concerned with winning, his primary concern was ensuring his players became "great citizen[s]." As the trial court found, he did this by creating a family atmosphere and culture—a brotherhood—by which players would commit themselves to a program that would provide them with opportunities to matriculate to a four-year college or university and obtain scholarships. As Madec explained at the hearing, most players came from broken backgrounds and homes, and they did not have the talent, grades, or test scores needed to go straight to a four-year school. More than winning conference championships, Madec evaluated his success as a coach based on the matriculation rate of student athletes into four-year schools with full-ride scholarships, and whether they became productive members of society. Madec further made a commitment to his recruits to develop them in all areas of their lives, including making a "full blown commitment" to their academic and social life, and overall well-being. Based on this evidence, the trial court reasonably could find that while Madec overstepped the line at times, such as by using food and apparel to reward and encourage

35.

team members or his approval of team members not wearing underwear while playing, he generally met the District's rules and expectations.

The District complains the trial court erroneously used character evidence to make substantive findings. In its decision, the trial court extensively cited hearing testimony from students, administrators, and colleagues about Madec's character and coaching philosophy. For example, Student 18, who received a full athletic scholarship to a four-year university after playing at Fresno City, testified that Madec taught him "a lot of lessons about life and just how to carry [himself], what real work is," while Student 21 felt Madec was the "second most influential person in [his] life" and Madec was able to change the players' "perspective on life for the better."

Cynthia Azari, Fresno City's president from 2008 to 2011 and interim president from 2014 to 2015, testified that Madec was a "great coach" who helped his players develop academic and social skills and helped train them to be decent human beings. Williams, the women's softball coach, testified Madec interacted with his students and student athletes "in a very respectful manner," and as a coach, he was "very passionate and intense," but also "very kind and generous." Madec provided "guidance and direction for [team members] and helped them become … productive citizens … and … successful citizens and responsible young men."

Ned Doffoney, who served as Fresno City's president from 2002 through 2008 and hired Madec as the head basketball coach, testified Madec was supportive of students, the college, and the community. Paul Keysaw, Fresno City's men's wrestling coach, believed Madec was a "great coach," a "great instructor," and "a man that leads by example." Eric Swain, who had been employed as Fresno City's athletic director from 2015 to 2017 and whose son played basketball at Fresno City under Madec, testified Madec developed a "[v]ery strong bond" with his student athletes, and he showed "tough love" but reinforced with "a lot of positive, high expectations." John Jordan, the dean of students and boys varsity basketball coach at a private boys' school in Southern California and whose son

played basketball under Madec at Fresno City from 2010 to 2013, testified Madec's program exuded many of the qualities that good coaches strive for, Madec was one of two men that made a difference in his son's life, and Madec was able to help student athletes change their "trajectory" so they could go on to graduate from four-year colleges.

The District argues this testimony is irrelevant because these witnesses were unaware of Madec's rules violations. Even so, the cited testimony supports Madec's testimony that he primarily was concerned about the academic, social, and character development of his players, and provides examples of how others experienced Madec's coaching methods and philosophy and how he positively influenced people. Moreover, this testimony was not used, as the District asserts, to determine whether Madec was honest in this matter. Rather, Madec's credibility was assessed based on the sincerity of his own testimony.

The trial court also noted the 117 letters of support that Madec introduced, finding they bolstered Madec's testimony that his priority was to help students matriculate to four-year schools.[34] The District argues the trial court's reliance on the letters was improper because at the administrative hearing the District objected to the admission of the letters as hearsay. Government Code section 11513, subdivision (d) provides: "Hearsay evidence may be used for the purpose of supplementing or explaining other evidence but over timely objection shall not be sufficient in itself to support a finding unless it would be admissible over objection in civil actions." Thus, hearsay "is perfectly acceptable evidence to rely upon in an administrative proceeding to supplement or explain other admissible evidence," but it "is insufficient to support a point itself."

---

[34] The ALJ cited excerpts from some of these letters. For example, the head coach of the women's basketball team at another community college stated Madec "demonstrated by his philosophies of teaching and coaching that success is attainable" and the coach found Madec to be "very good and fair with his players" and showed "great concern for them both academically and athletically." The Colorado Mesa University's assistant men's basketball coach "personally attest[ed] to the fact that Coach Madec plays a transformative role in these players' lives."

37.

(*Malaga County Water Dist. v. State Water Resources Control Bd.* (2020) 58 Cal.App.5th 447, 480; see *The Utility Reform Network v. Public Utilities Com.* (2014) 223 Cal.App.4th 945, 966 [agency's finding cannot be sustained where it is based on uncorroborated hearsay evidence].) Here, the letters could properly be used to supplement or explain Madec's statements during the investigative interviews and his hearing testimony concerning his coaching methods and philosophy. Therefore, the trial court did not err in referring to the letters in that context.

## III.    Misconduct

Having determined that the trial court's findings concerning whether Madec violated the Rules and District policies are supported by substantial evidence, we turn to the trial court's findings on whether that conduct fell within the statutory causes for termination.

The governing board of a community college district may seek the dismissal of a regular (tenured) employee such as Madec for one of eight specific causes. (Ed. Code, § 87732.) As applicable here, these causes include "[i]mmoral or unprofessional conduct," "[d]ishonesty," "[e]vident unfitness for service" and "[p]ersistent violation of, or refusal to obey, the school laws of the state or reasonable regulations prescribed for the government of the community colleges by the board of governors or by the governing board of the community college district employing him or her." (Ed. Code, § 87732, subds. (a), (b), (d) & (f).) The community college district bears the burden of establishing the appropriateness of the action by a preponderance of the evidence. (Evid. Code, §§ 115, 500; *Gardner v. Commission on Professional Competence* (1985) 164 Cal.App.3d 1035, 1038–1040 [standard of proof required to discharge teacher is preponderance of the evidence].)

Here, the trial court rejected the District's allegations that: (1) Madec knew or suspected his rental practices and provision of meals and snacks violated the bylaws; (2) he was dishonest during the investigation and therefore failed to cooperate; and

38.

(3) Madec's coaching methods or philosophy fell below the District's reasonable expectations. The trial court, however, found the District proved that Madec violated the Rules and the District's Board Policies and Administrative Regulations when he: (1) did not ensure his rental housing was equally available to all Fresno City students; (2) did not ensure that the snacks he provided were equally available to all Fresno City students; (3) provided postgame meals on a frequent basis and held team banquets and bonding meals outside the basketball season; (4) provided apparel to student athletes to encourage or reward participation in the program; and (5) did not distribute apparel on terms equally available to all Fresno City students. As discussed above, the trial court did not err in making these findings, as they are based on credibility determinations and supported by substantial evidence.

The issue is whether the violations the trial court found Madec committed establish his evident unfitness for service, immoral or unprofessional conduct, dishonesty, or persistent violation of the Rules.

### A. Evident Unfitness for Service

The District sought to discharge Madec for "[e]vident unfitness for service." (Ed. Code, § 87732, subd. (d).) In the context of a teacher, " 'evident unfitness for service' … means 'clearly not fit, not adapted to or unsuitable for teaching, ordinarily by reason of temperamental defects or inadequacies.' Unlike 'unprofessional conduct,' 'evident unfitness for service' connotes a fixed character trait, presumably not remediable merely on receipt of notice that one's conduct fails to meet the expectations of the employing school district." (*Woodland Joint Unified School Dist. v. Commission on Professional Competence* (1992) 2 Cal.App.4th 1429, 1444 (*Woodland*), fn. omitted.)

In determining whether there is evident unfitness for service, the criteria for unfitness set out in *Morrison* "must be analyzed to determine, as a threshold matter, whether the cited conduct indicates unfitness for service." (*Woodland*, *supra*, 2 Cal.App.4th at p. 1445; *Board of Education v. Jack M.* (1977) 19 Cal.3d 691, 696

39.

[where teacher was charged with immoral conduct and evident unfitness for service, the determinative test was "fitness to teach"].) If an analysis of the *Morrison* criteria indicates a teacher is unfit for service, "the next step is to determine whether the 'unfitness' is 'evident'; i.e., whether the offensive conduct is caused by a defect in temperament." (*Woodland*, at p. 1445.)

In *Morrison*, our Supreme Court concluded that because terms such as immoral or unprofessional conduct, or moral turpitude, are so general they must be given meaning by relation to the profession involved. (*Morrison*, *supra*, 1 Cal.3d at p. 220.) In other words, a teacher may have committed an immoral act, but unless it indicated the teacher's unfitness to teach, it is not an appropriate basis for discharge. (*Id.* at pp. 225–226 [incidents of extramarital heterosexual conduct would not constitute " 'immoral conduct' sufficient to justify revocation of a life diploma without any showing of an adverse effect on fitness to teach"].)

Our Supreme Court listed the following matters the fact finder "may consider" in determining whether a teacher's conduct indicates unfitness to teach: (1) "the likelihood that the conduct may have adversely affected students or fellow teachers" and the degree of adversity anticipated; (2) "the proximity or remoteness in time of the conduct"; (3) the type of certification the teacher holds; (4) "the extenuating or aggravating circumstances, if any, surrounding the conduct"; (5) "the praiseworthiness or blameworthiness of the motives resulting in the conduct"; (6) "the likelihood of the recurrence of the questioned conduct"; and (7) "the extent to which disciplinary action may inflict an adverse impact or chilling effect upon the constitutional rights of the teacher involved or other teachers." (*Morrison*, *supra*, 1 Cal.3d at p. 229.) "These factors are relevant to the extent that they assist the [fact finder] in determining whether the teacher's fitness to teach, i.e., in determining whether the teacher's future classroom performance and overall impact on his students are likely to meet the [District's] standards." (*Id.* at pp. 229–230.)

Only the relevant factors need to be analyzed. (*West Valley-Mission Community College Dist. v. Concepcion* (1993) 16 Cal.App.4th 1766, 1777.) There must be a "factual nexus between [the teacher's misconduct] and unfitness to teach." (*San Dieguito Union High School Dist. v. Commission on Professional* Competence (1982) 135 Cal.App.3d 278, 288.) Fitness to teach is a question of ultimate fact that we review for substantial evidence. (*Board of Education v. Jack M.*, *supra*, 19 Cal.3d at p. 698, fn. 3; *West Valley–Mission Community College Dist.*, at p. 1775; *Broney v. California Com. on Teacher Credentialing* (2010) 184 Cal.App.4th 462, 475.)

Here, the trial court analyzed the *Morrison* factors in determining Madec's fitness to teach and found: (1) while there was no question the sanctions issued against the basketball team adversely impacted the students who expected to play at Fresno City as well as Fresno City itself, Fresno City's administration shared some responsibility for the sanctions and neither Madec nor the administration anticipated any adversity from the conduct that is the subject of this litigation; (2) Madec's conduct was not remote in proximity or time; (3) there were extenuating circumstances, as Madec was genuine and sincere in caring for those he felt responsible for and his motives behind feeding, safely sheltering, and providing apparel for the team, the student athletes, and other students were noble and praiseworthy, and the record defuses the District's attempts to make these circumstances appear aggravating; (4) recurrence of the questioned conduct was unlikely, as the Rules had been clarified and Madec withdrew from assisting student athletes; and (5) while this action has had a chilling effect on coaches trying to assist their players, that is not a constitutional right. The trial court concluded that while Madec had a hard driving and competitive personality, the District too easily conflated that personality with someone who was willing to cheat and it was mistaken in doing so.[35]

---

[35] Because the trial court determined Madec was fit to teach under the *Morrison* factors, it was not required to reach the issue of whether Madec was *evidently* unfit for teaching due to a temperamental defect. (*Woodland*, *supra*, 2 Cal.App.4th at p. 1445.) Thus, the District's contention that the trial court committed an error of law by conflating

41.

The District asserts there is no doubt Madec's actions and CCCAA sanctions were directly related to Madec's job as a coach and teacher and therefore showed his unfitness to teach. The District argues: (1) the trial court minimized the impact of the sanctions and improperly found the District bore some responsibility for the violations; (2) the trial court did not properly analyze the proximity in time, which weighed in favor of dismissal because the District acted timely to impose discipline; (3) Madec's chosen field of athletics required him to follow the Rules; (4) the trial court erred in finding there were extenuating, but not aggravating, circumstances, as Madec's persistent violations of CCCAA and District rules were extremely blameworthy; (5) the trial court erroneously concluded the conduct was not likely to recur, as Madec intended to violate the Rules and only stopped when he was caught, there was little evidence he stopped because he knew it was wrong, he did not care about complying with the Rules, and there was no evidence he learned his lesson or accepted responsibility; and (6) there was no chilling effect on Madec's constitutional rights because his conduct violated the law.

In arguing that Madec is unfit to teach, the District ignores the substantial evidence standard of review. Based on the evidence, much of which we discussed above, the trial court reasonably could find that while Madec violated the Rules, he cooperated with the investigation to the best of his ability and generally operated within the District's expectations, and there is no factual nexus between Madec's Rules violations and his fitness to teach. In analyzing the *Morrison* factors, the trial court acknowledged the Rules violations had a substantial adverse impact on Fresno City students and team members, as evidenced by the CCCAA sanctions, the degree of adversity for student athletes was substantial and self-evident, and the program's ability to recruit new team members was harmed. As we explained above, the trial court could find from the evidence that the adverse impact on the students and college did not rest solely on

the charge of evident unfitness for service with the determination of fitness to teach using the *Morrison* factors is meritless.

42.

Madec's shoulders, as the administration was on notice of at least some of Madec's conduct.

The trial court further could find there were extenuating circumstances surrounding the violations—that Madec's priority was to help students matriculate into four-year universities, he was motivated to help provide safe housing and supplemental nutrition to student athletes, and he proceeded with his plan to provide rental housing after consulting Cantu and in the belief that he was complying with the Rules. The trial court could find that Madec's motives were to help student athletes, not harm them, and he did not intend to commit wrongful acts.

The District argues there were aggravating circumstances because Madec did not demonstrate insight into his actions, take ownership for them, or exhibit empathy for the students and community he harmed. The trial court, however, reasonably could reject this argument. As the ALJ found, it was unsurprising that Madec would refrain from open apologies or admissions of fault given that the investigation and disciplinary processes were largely adversarial and Madec was represented by attorneys throughout these proceedings.

Finally, the trial court reasonably could find that Madec's Rules violations, and the resulting negative impact, were not likely to recur. While the District asserts Madec intended to violate the Rules and stopped only when he was caught, the trial court viewed the evidence differently—that Madec believed he had been complying with the Rules and when he learned his ownership of the rental homes and provision of food were an issue, he divested himself of the rental properties and demonstrated a readiness to change his pattern of providing food to students. The District argues there is a risk Madec will not change, as he never expressed remorse or accepted responsibility for his actions. But as we have stated, it is unsurprising that Madec did not apologize or express remorse, as the proceedings were adversarial.

In sum, when the trial court's findings on the *Morrison* factors are considered together, the circumstances of the violations do not show that Madec is unfit to teach. Madec honestly believed he was complying with the Rules and as a result of the District's investigation, he changed his behavior and demonstrated a willingness to comply. While the District seeks to terminate Madec from his position as a faculty member, no evidence was presented to show that his teaching was compromised by his Rules violations. The District asserts Madec was not a worthy role model for his students, but the trial court's finding otherwise is amply supported by the record. Since Madec was not unfit to teach, the trial court did not err in finding that the District did not establish evident unfitness for service.

### B.    *Immoral Conduct/Dishonesty/Persistent Violation of the Rules*

The remaining causes for dismissal fail because application of the *Morrison* factors support the trial court's finding that Madec is fit to teach. Our Supreme Court has held with respect to grounds such as immoral conduct and dishonesty, "the determinative test [is] fitness to teach" because these terms "are so broad and vague that, standing alone, they could be constitutionally infirm." (*Board of Education v. Jack M.*, *supra*, 19 Cal.3d at p. 696; *Fontana Unified School Dist. v. Burman* (1988) 45 Cal.3d 208, 220, fn. 12 [*Morrison* analysis applies to attempt to discipline permanent employee on grounds of dishonesty].) The trier of fact must determine both "whether the charged conduct in fact occurred" and whether that conduct, measured against the *Morrison* criteria, "demonstrates unfitness to teach and thus constitutes 'immoral or unprofessional conduct' within the meaning of the statute." (*Fontana Unified School Dist.*, at p. 220.)

Thus, as to whether Madec's Rules violations constitute immoral conduct, the issue is whether those violations, measured against the *Morrison* criteria demonstrate unfitness to teach. We have already upheld the trial court's conclusion that the evidence showed Madec was fit to teach. The trial court found that while some of Madec's comments during the investigation were "cringe-worthy," when it considered those

comments in the context of the broader good Madec accomplished, as well as the accolades others heaped on him at the hearing, it would be inappropriate to dismiss Madec for immoral conduct.[36]

The District argues that while Madec's comments exemplify an inconsiderate attitude toward the public welfare, his "pattern of flagrant misconduct goes well beyond this" and included willfully ignoring athletic rules and laws to create his championship team, he did not care about compliance, and he lied about his actions to evade discipline. As we have explained, the trial court rejected this characterization of Madec's actions and instead found, based on evidence produced at the hearing, that Madec did not willfully ignore athletic rules and was honest during investigative proceedings. Based on these findings, the trial court did not err in finding the District did not establish Madec engaged in immoral conduct.

A faculty member may be dismissed for dishonesty. (Ed. Code, § 87732, subd. (b).) Dishonesty indicates a disposition to deceive (*Midway School Dist. v. Griffeath* (1946) 29 Cal.2d 13, 18) and "denotes an absence of integrity; a disposition to cheat, deceive, or defraud" (*Small v. Smith* (1971) 16 Cal.App.3d 450, 456). Even if a teacher is dishonest, the teacher may not be dismissed unless the dishonesty demonstrates an unfitness to teach. (*Fontana Unified School Dist. v. Burman*, *supra*, 45 Cal.3d at p. 220 & fn. 12.)

Here, the trial court acknowledged the District's belief that Madec was a liar and recognized there were some inconsistencies in Madec's statements made during his interviews and hearing testimony. The trial court, however, stated it would be surprised if

---

[36] "Immoral conduct" (§ 87732, subd. (a)) has been defined as conduct hostile to the general public's welfare, including conduct that is " ' "inconsistent with rectitude, or indicative of corruption, indecency, depravity, dissoluteness; or as willful, flagrant, or shameless conduct showing moral indifference to the opinions of respectable members of the community, and as an inconsiderate attitude toward good order and the public welfare." ' " (*San Diego Unified School Dist. v. Commission on Professional Competence* (2011) 194 Cal.App.4th 1454, 1466.)

there were not inconsistencies and gave a strong presumption of correctness to the ALJ's finding that these inconsistencies "were more closely aligned with inadvertence and error rather than dishonesty and deception."[37]  The trial court accepted the ALJ's finding as to Madec's "honesty and sincerity … despite the best efforts of [the District] to characterize them otherwise."

The District disagrees with the trial court's finding that Madec was not dishonest. It argues Madec lied to and concealed information from the investigator, chose his friend to pose as the property manager but they could not keep their stories straight, knew or should have known team members lived at his properties as their addresses were listed on eligibility forms that Madec signed off on, he misrepresented his knowledge about the rents that were collected, and he was well-versed in the Rules because of his training, testing and experience.

In so arguing, the District again ignores the substantial evidence standard of review.  As we have explained, the trial court reasonably could adopt a finding that Madec testified sincerely and truthfully and was honest throughout these proceedings. We are required to accept the trial court's credibility determination in assessing whether substantial evidence supports its findings unless that testimony is inherently improbable or wholly unreasonable.  (See *Oldham*, *supra*, 235 Cal.App.3d at p. 1065.)  Our review of the record does not show the testimony of Madec or Buenrostro was improbable or unreasonable.  Thus, the trial court did not err in finding that any inconsistencies were due to inadvertence or error rather than dishonesty or deception.

---

[37]     The ALJ rejected the District's argument that the inconsistencies between Madec's testimony and other evidence, including statements he made during his investigative interviews, showed Madec was dishonest throughout these proceedings or that "his 'dishonesty and evasiveness [were] calculated and intentional.' "  The ALJ found the preponderance of the evidence did not support a finding that Madec was dishonest in these proceedings, lacked integrity, or had " 'a disposition to cheat, deceive, or defraud.' "  Accordingly, the ALJ found the District failed to meet its burden of establishing Madec was dishonest or committed acts of dishonesty.

Finally, Education Code section 87732, subdivision (f), authorizes dismissal for "persistent violation of, or refusal to obey" applicable laws or reasonable regulations, which must be premised on a " 'persistent,' *willful* 'violation or refusal.' " (*San Dieguito Union High School Dist. v. Commission on Professional Competence* (1985) 174 Cal.App.3d 1176, 1196, italics added.) Proof of a violation "requires a showing of intentional and continual refusal to cooperate." (*Ibid,* italics omitted.) The word "persistent" is defined by lexicographers as " ' "refusing to relent; continuing, especially in the face of opposition … stubborn; persevering … constantly repeated." ' " (*Ibid.*)

The trial court rejected the District's argument that because Madec took a test every year on issues related to the bylaws he knew he was violating the Rules. The trial court instead found the evidence showed that Madec did not know he was violating the Rules because he divested himself of the rental properties and reduced the provision of food once he was made aware of the violations. The trial court further found the record showed Madec did not stubbornly or surreptitiously continue to engage in violations; rather, he was "willing to change his behavior to more closely align himself with the conference bylaws and, subsequently, the administrative regulations and State law in these areas."

The District argues Madec persistently violated the Rules. The District asserts the CCCAA tests gave Madec the opportunity to learn the Rules, which clearly prohibit coaches from providing items to student athletes on different terms than other students or from rewarding students.[38] The District claims it is not credible to state that Madec did

---

[38]    The District points out that the CCCAA found Madec violated the Rules and asserts the CCCAA's determinations regarding the nature and severity of Madec's conduct deserve some deference since it is the agency that develops and enforces the Rules. The case the District relies on, *Balakrishnan v. Regents of the University of California* (2024) 99 Cal.App.5th 513, is inapplicable here since there is no issue about the interpretation of the Rules for the purpose of showing Madec's violations. Notably, the CCCAA's findings and sanctions relied on the findings in the investigative report;

47.

not know his conduct violated the Rules, there is ample evidence he knew he was violating them, and even if he thought he was complying with the Rules, he persistently failed to learn them.

Once again, the District ignores the substantial evidence standard of review. Based on Madec's testimony, the trial court reasonably could find that Madec believed he was complying with the Rules and did not willfully violate them, and that, as the ALJ found, the preponderance of the evidence did not support a finding that Madec's violations were intentional or that his conduct continued in the face of opposition or characterized by a continual refusal to cooperate. The District asserts that Madec's persistent disregard of the Rules is sufficient even if he did not know he was violating them, citing *Board of Education v. Mathews* (1957) 149 Cal.App.2d 265. But there, the teacher, whose dismissal for persistent violation of school regulations was upheld, was absent for 10 consecutive days during one October without permission and refused to return to her duties the following school year when ordered to do so. (*Id.* at pp. 267, 271–272.)

In contrast here, when it became clear to Madec that his conduct was being questioned, he divested himself of the properties and curtailed his provision of food. The trial court reasonably could find that Madec was not intentionally insubordinate but rather operated under the belief that his conduct complied with the Rules. (See, e.g., *Midway School Dist. v. Griffeath*, *supra*, 29 Cal.2d at p. 18 [when considering dismissal for persistent violation of regulations, "[t]he Legislature undoubtedly intended that opportunity for correction be available and refrained from providing for dismissal for a single violation of regulations, or until repeated violations could be considered persistent…. A teacher who is 'continually insubordinate … may seriously affect the discipline in a school, impair its efficiency, and teach children lessons they should not

neither Yates nor Murray conducted an independent investigation of the investigator's findings.

learn.' [Citation.] The emphasis is on 'persistent' and 'continually.' The trial court expressly found that the defendant was not motivated by an attitude of insubordination"].)

### C. Conclusion

In sum, our review in this case is constrained by the substantial evidence standard of review. Having found there is evidence to support the trial court's factual findings and no reason to reject its credibility determinations, we will affirm the trial court's decision to deny the petition because the District did not establish cause to discipline Madec under Education Code section 87732.

## DISPOSITION

The order denying the petition for writ of mandate is affirmed. Costs on appeal are awarded to real party in interest Edward Madec.


DE SANTOS, J.

WE CONCUR:


FRANSON, Acting P. J.


PEÑA, J.